## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____
)
CASITAS MUNICIPAL WATER DISTRICT,  )
)
Plaintiff,  )
)       No. 05-168
v.  )
)       Hon. John P. Wiese
UNITED STATES,  )
)
Defendant.  )
_____ )

## PLAINTIFF'S POST-TRIAL SUBMISSION OF
## PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS

Roger J. Marzulla
Nancie G. Marzulla
MARZULLA LAW, LLC
1150 Connecticut Avenue, NW
Suite 1050
Washington, DC 20036
(202) 822-6760 (telephone)
(202) 822-6774 (facsimile)

Dated:  January 17, 2011                    Counsel for Plaintiff

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

_____

CASITAS MUNICIPAL WATER DISTRICT,

                Plaintiff,

                v.

UNITED STATES,

                Defendant.

_____

No. 05-168

Hon. John P. Wiese

**PLAINTIFF'S POST-TRIAL SUBMISSION OF
PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS**

In August of 1997, 40 years after Congress authorized construction of the Ventura River Project ("Ventura Project" or the "Project"), the National Marine Fisheries Service ("NMFS") listed as endangered the Southern California evolutionarily significant unit ("ESU") of the west coast steelhead trout.  As a result, since February 20, 2005, Defendant (the "Government") has required by the coercive power of the Endangered Species Act ("ESA") that Plaintiff, the Casitas Municipal Water District, annually divert a permanent, specified quantity of its water from the Robles-Casitas Canal for operation of the fish passage facility, without just compensation.  Although the United States owns the Ventura River Project land and facilities, Casitas owns the water right associated with the Project.  The principal question before this Court is whether the Government's permanent physical annual taking of 3,492 acre-feet of Casitas' water is compensable under the Fifth Amendment and, if so, the amount of just compensation due.

1

## I.     PROCEDURAL HISTORY

Casitas filed this suit for breach of contract and an unconstitutional taking of its water rights on January 26, 2005.  The Government filed its Answer on May 23, 2005.[1] On October 2, 2006, the Court ruled on the parties' cross-motions for summary judgment on the contract claims, holding that the Government was not contractually obliged to reimburse Casitas the approximately $9.5 million it incurred in constructing the fish facility on the Ventura River Project.[2]

The Government moved for partial summary judgment on November 22, 2006, requesting that the Court determine the appropriate takings standard applicable to Casitas' takings claims, which Casitas opposed on the grounds that there were material facts in dispute and that the motion would further delay resolution of the substantive issues.  The Court ruled for the Government, holding that the takings issue should be analyzed as a regulatory taking.[3]

Casitas appealed to the Federal Circuit, which affirmed the court's holding on the contractual claim but overruled the court's determination for the takings claim, holding instead that it was to be analyzed as a physical taking:

> [T]he water that is diverted away from the Robles-Diversion Canal is permanently gone.  Casitas will never, at the end of any period of time, be able to get that water back.  The character of the government action was a physical diversion for a public use—the protection of an endangered species.   The government-caused diversion to the fish ladder has permanently taken that water away from Casitas.  This is not temporary, and it does not leave the right in the same state it was before the

---

[1] Answer (May 23, 2005) [Docket No. 13]
[2] *See Casitas Municipal Water Dist. v. United States*, 72 Fed. Cl. 746 (2006); Coultas, Tr. 72:21–23.
[3] *Casitas Municipal Water Dist. v. United States*, 76 Fed. Cl. 100 (2007).

government action.  The water, and Casitas' right to use that water, is forever gone.  Unlike *Tahoe-Sierra*, the government, in this case, directly appropriated Casitas' water for its own use—for the preservation of an endangered species.  The government requirement that Casitas build the fish ladder and divert water to it should be analyzed under the physical takings rubric.[4]

The Federal Circuit also denied rehearing and rehearing en banc.[5]

In remanding this case back to this Court for resolution, the Federal Circuit identified the issues for remand as follows:

On remand, after receiving the views of the parties and ruling on any matters left open during the summary judgment proceedings, the Court of Federal Claims will be in a position to determine the ultimate question of whether a taking occurred in this case.  If the court determines that a taking occurred, it will be necessary for it to determine the amount of damages to which Casitas is entitled.  The damages calculation may taken into account the fact that Casitas' license from the State of California allowed it to divert up to 107,800 acre-feet of water per year from the Ventura River and to put to beneficial use up to 28,500 acre-feet of the diverted water.[6]

The Court conducted a trial on liability and damages lasting for 10 days from October 18 to October 29, 2010.

## II.   PROPOSED FACTUAL FINDINGS

**The Ventura River Project Was Designed to Capture and Store Periodic Rainfall in Order to Provide a Stable Drinking and Irrigation Water Supply for Area Residents**

1.   The Ventura River Project is located in Ventura, California, on the coast of southern California about 60 miles northwest of Los Angeles.  Authorized on March 1, 1956, the Ventura River Project was the last of three major U.S. Bureau of

---

[4] *Casitas Municipal Water Dist. v. United States*, 543 F.3d 1276, 1296 (2008), *reh'g and reh'g en banc denied*, *Casitas Municipal Water Dist. v. United States*, 556 F.3d 1329 (Fed. Cir. 2009).
[5] *Casitas Municipal Water Dist. v. United States*, 556 F.3d 1329 (Fed. Cir. 2009).
[6] *Casitas*, 543 F.3d at 1298.

Reclamation ("Reclamation") projects in the region.[7]  The Project boundaries encompass the city of Ojai, Upper Ojai, the Ventura River Valley area, the city of Ventura to Mills Road, and the Rincon and beach area to the Pacific Ocean and Santa Barbara County line.

2.      Ventura, California has a Mediterranean-type climate, meaning that it receives most of its precipitation during the winter and is generally dry during the summer months.[8]  Rainfall can vary widely from year to year; for example, rainfall has been as little as 10 inches in some years and as much as 40 inches in others.[9]  Generally, Ventura County experiences droughts within a 20-year cycle.[10]

3.      The Ventura River watershed drains 228 square miles of coastal southern California.[11]  The watershed is almost completely in Ventura County although the northwest corner is located in Santa Barbara County.[12]  The headwaters of the Ventura River are in the Transverse Ranges.  The river flows 16.5 miles from the confluence of Matilija and North Fork Matilija Creek to the Pacific Ocean.[13]  The Robles Diversion is located approximately 1.5 miles downstream from the confluence of Matilija Creek and North Fork Matilija Creek, which join to form the Ventura River.[14]  Because the Ventura River is fed by rainfall (not snowmelt), it is ephemeral—or "flashy"—usually running

---

[7] Pub. L. No. 423, 70 Stat. 32 (1956).
[8] Pl.'s Ex. 271 at 2–3; Pl.'s Ex. 257 at 6; Joint Ex. 45 at 4-1, 4-7, 4-9; Def.'s Ex. 202 at 26; Coultas, Tr. 47:24 to Tr. 49:10; Coultas, Tr. 62:8 to Tr. 63:4; Word, Tr. 361:21 to Tr. 362:3; Baldrige, Tr. 630:2–8.
[9] Pl.'s Ex. 257 at 6; Pl.'s Ex. 258 at 10 (Figure 3-10 depicting yearly rainfall in Ventura from 1874 to 2006); Joint Ex. 45 at 4-1; Coultas, Tr. 48:15–19; *see also* Pl.'s Ex. 13 at 3 ¶ 4.
[9] Pl.'s Ex. 257 at 6; Pl.'s Ex. 269 at 12–14.
[10] Pl.'s Ex. 257 at 6; Coultas, Tr. 49:4; *accord* Joint Ex. 4-1.
[11] Pl.'s Ex. 45 at 1-3; *see also* Pl.'s Ex. 9 at 1-12.
[12] Pl.'s Ex. 45 at 1-3.
[13] *Id.*
[14] *Id.*

only in the winter "wet season."[15]   And because the Ventura River is often dry, large

rainstorms can produce torrents of water.[16]

4.      The need for more water in the Ventura area had been recognized for

many years prior to the Ventura River Project's authorization.[17]   Historical records during

the 1940s and early 1950s report widespread alarm that then existed in the Ventura River

Basin due to seriously over-depleted water supplies caused by the long-term drought.[18]

One article during this period reports that the city of Ventura was down to its last water

reserve:  "Nevertheless, as matters stand, the cold fact is that we are down, for the

present, to our last reserve. . . . For quite a period of years, Ventura, and much of its

backcountry, too, has been 'getting by' on a water supply in ways that are

almost miraculous."[19]

5.      In October of 1952, the Ventura River Municipal Water District (now

Casitas Municipal Water District)[20] was formed to provide a water supply to support the

economic growth of Ventura County.  The District worked with Reclamation to develop

feasibility studies for a new reclamation project to provide a stable water supply for

Ventura area residents.[21]

---

[15] Joint Ex. 45 at 4-1.
[16] Pl.'s Ex. 257 at 6; Joint Ex. 45 at 4-1, 4-7.
[17] *E.g.*, Joint Ex. 79 at 2.
[18] Pl.'s Ex. 8; Pl.'s Ex. 9; Pl.'s Ex. 13; Pl.'s Ex. 272 at 7–9; Wickstrum, Tr. 839:9 to Tr. 840:3; Wickstrum, Tr. 840:24 to Tr. 842:4.
[19] Pl.'s Ex. 272 at 7 (see the article on the right)
[20] The District's name was changed from Ventura River Municipal Water District to the Casitas Municipal Water District in 1971.  Pl.'s Ex. 272 at 4; Barnett, Tr. 148:17–22.
[21] Pl.'s Ex. 13; Barnett, Tr. 169:2–8.

6.    In 1954, the Secretary of Interior and Reclamation sent a feasibility study to Congress, further explaining why the Project was urgently needed:

> Development of an additional firm water supply is urgently needed in the Ventura River Project area for stabilization of present agricultural and other economic activities, for new irrigated lands, for new industries, a rapidly expanding population, and for new economic opportunities. Present water supplies are inadequate both for agricultural use and for municipal and industrial purposes. Many irrigated areas now experience serious shortages including the lands around the edge of Ojai Valley normally adequately supplied from ground water but where wells went dry during the recent drought . . . The city of Ventura already has outgrown its water supply. . . . Thus because of the precarious supplemental supply that the beach wells provide, and the wide range in the quantity obtainable from the river, the city of Ventura has an immediate need for a firm supplemental water supply.[22]

7.    In authorizing the Project, Congress thus emphasized that its overarching purpose was to ensure that the Ventura River Basin area possessed a reliable supply of drinking, industrial, and irrigation water in this drought-prone region.[23] The Ventura River Project was also intended to supplement groundwater supplies (wells) and to serve as an emergency backup water supply to all area water users.[24]

8.    Reclamation then built the Project to meet these objectives, including designing Lake Casitas with a large storage capacity relative to other area reservoirs such as Cachuma in neighboring Santa Barbara County.[25] Lake Casitas has a working storage capacity of 254,000 acre-feet of water.[26] The available water supply in the Ventura River

---

[22] Pl.'s Ex. 13 at 7 ¶ 12.

[23] Pub. L. No. 423, 70 Stat. 32 (1956); *see also* Pl.'s Ex. 13 at ix (unnumbered summary page); *id.* at 7 ¶ 12.

[24] Pl.'s Ex. 13 at 8–9 ¶¶ 13–15; Barnett, Tr. 162:10 to Tr. 163:15; Word, Tr. 360:21 to Tr. 361:12.

[25] Pl.'s Ex. 12 at 6–9.

[26] Pl.'s Ex. 12 at 1; Pl.'s Ex. 272 at 5; Barnett, Tr. 149:5–7.

Basin is directly related to precipitation patterns (yearly and daily).[27]  The Ventura River

Project's design allows for Casitas to store water during the wet periods so that water can

be available for use during dry periods.[28]  In order to fulfill its obligations to its water

users and in light of the arid climate, and periodic drought conditions, the Project was

designed to allow Casitas to divert as much water as possible when there is water in the

River to divert.[29]

     9.     Reclamation also designed and built components of the Ventura River

Project to accommodate the torrents of flow associated with the flashy, ephemeral nature

of the Ventura River.[30]

     10.     Casitas' water planning is based on the concept of safe yield, the standard

of water planning that uses "worst case scenario" data to limit water delivery risk.[31]  In

designing the Ventura River Project, Reclamation calculated that a reservoir of

approximately 250,000 acre-feet would provide a safe yield of 28,500 acre-feet per year

and designed the reservoir accordingly.  Importantly, that calculation was based on

rainfall data from what turned out to be the second worst drought on record (1918–1936)

because Reclamation had no way of knowing in 1954 that this area was in the midst of

what would turn out to be the worst drought on record (1944–1965).[32]

---

[27] Pl.'s Ex. 257 at 6; Joint Ex. at 4-1.

[28] Pl.'s Ex. 257 at 6; Pl.'s Ex. 269 at 12–13.

[29] Word, Tr. 362:20–22; Word, Tr. 379:4–12; *see also* Joint Ex. 45 at 4-1.

[30] Pl.'s Ex. 257 at 6; Pl.'s Ex. 269 at 12–14.

[31] Pl.'s Ex. 269 at 3.

[32] Barnett, Tr. 170:7–9; Wickstrum, Tr. 841:23 to Tr. 842:22 ("I believe this safe-yield actually was 27,800, and I think they rounded it up to 28,000. . . . In this particular yield calculation they used the period of 1918 through 1936, . . . they picked that as the longest, most intense drought that they would use to base the sizing selection of Lake Casitas"); Joint Ex. 3 at 1; Pl.'s Ex. 272 at 5.

11.     Construction of the Ventura River Project was completed in 1959.  But because of the ongoing drought, and the corresponding unavailability of water to divert from the Ventura River, it took another 20 years for Lake Casitas to fill.[33]

12.     The Ventura River Project today supplies water for domestic, municipal, and industrial uses in Ventura County, California, including drinking water to almost 70,000 residents of Ventura County, including 30,000 homes in the city of Ventura.[34] The Project also provides a dependable water supply for roughly 6,500 acres of highly productive farmland on which crops such as citrus, walnuts, and avocadoes are grown.[35] And the Project serves as an emergency backup water supply for well-water users, to the city of Ventura, and for other water users in the Ventura River Basin.[36]

13.     Casitas does not have—and has never had—surplus water.[37]  All of its water is delivered to its customers, stored for future deliveries, or made available to other users on an emergency backup basis.

14.     There is strong scientific evidence that precipitation is likely to decrease in coming decades in southern California where the Ventura River Project is located.  In addition to decreased rainfall totals, experts such as Dr. Edward Aguado believe that the area may be subject to a greater occurrence of droughts.  According to Dr. Aguado, the "combination of greater water losses to evaporation [due to the overall warming of the

---

[33] Def.'s Ex. 202 at 18; Barnett, Tr. 148: 17 to Tr. 150:18.
[34] Def.'s Ex. 202 at 18.
[35] Pl.'s Ex. 272 at 6; Coultas, Tr. 47:11–21.
[36] Coultas, Tr. 57:24 to Tr. 59:23; Word, Tr. 361:15–18; Wickstrum, Tr. 828:17 to Tr. 829:5.
[37] Word, Tr. 379:2–12.

climate] and decreased inputs of precipitation may lead to severe problems in water supply . . . ."[38]

**Ventura River Project Description**

15.     The Ventura River Project includes the Casitas Dam and its reservoir, Lake Casitas, the Robles Diversion Dam, and the Robles-Casitas Canal.[39]  Lake Casitas was formed by the construction of the Casitas Dam on Coyote Creek, which is located above the junction of the Creek and Ventura River.[40]  Approximately 60% of the Project's water comes from drainage into the Coyote and Santa Ana Creeks, both of which empty directly into Lake Casitas.[41]  Project water stored in Lake Casitas is later distributed for use through a conveyance system comprising 34 miles of pipeline, 9 pumping stations, and 6 balancing reservoirs.[42]

16.     The remaining 40% of the water for the Project comes from diversions from the Ventura River.[43]  The water of the Ventura River is impounded behind the Robles Diversion Dam, where Casitas either releases the water into the Robles-Casitas Canal for conveyance to Lake Casitas or releases the water over the Dam's spillway to flow downstream for use by downstream users or to flow out into the Pacific Ocean.[44]

---

[38] Pl.'s 258 at 12.
[39] Joint Ex. 45 at 4-20; Def.'s Ex. 202 at 18; Coultas, Tr. 61:11–17.
[40] Pl.'s Ex. 95 at B-21; Pl.'s Ex. 274 at 38 (unnumbered) (Figure 1); Joint Ex. 45 at 4-20; Joint Ex. 48 at 3.
[41] Pl.'s Ex. 274 at 38 (unnumbered) (Figure 1); Coultas, Tr. 61:12 to Tr. 62:3; Coultas, Tr. 108:9–13; Barnett, Tr. 156:13–19.
[42] Pl.'s Ex. 12 at 1; Barnett, Tr. 157:2; Barnett, Tr. 165:10–13; *see also* U.S. Bureau of Reclamation, Project Details — Ventura River Project, http://www.usbr.gov/projects/Project.jsp?proj_Name=Ventura%20River%20Project&pageType=ProjectPage (last visited Jan. 13, 2011).
[43] Word, Tr. 361:21 to Tr. 362:1.
[44] Joint Ex. 45 at 2-3, 2-25.

The Robles Diversion Dam is located on the Ventura River about 1.5 miles downstream from the confluence of Matilija Creek and North Fork Matilija Creek.[45]  Above the Robles Diversion Dam, the Matilija Creek and North Fork Matilija Creek provide about 78 square miles of drainage into the Ventura River.[46]  The Robles-Casitas Canal is approximately 5.2 miles long and operates by gravity, meaning that water runs downhill through the canal and empties into Lake Casitas.[47]

17.     Populations of steelhead trout in the Ventura River traditionally came from stocking sources during the early part of the twentieth century.[48]  Drought and the cessation of stocking in the 1930s contributed to the decline of the steelhead in the Ventura River.[49]  By the time of construction of the Ventura River Project in the 1950s, populations of steelhead were gone from the Ventura River.[50]

18.     Because there were no significant populations of steelhead in the Ventura River at the time the Ventura River Project was authorized, the California Department of Fish and Game ("California Fish and Game") initially proposed the inclusion of an inexpensive fish ladder on the chance that climate changes might one day result in the reestablishment of steelhead in the River:

---

[45] Joint Ex. 45 at 1-3.

[46] Barnett, Tr. 155:23 to Tr. 156:6.

[47] Barnett, Tr. 156:7–8.

[48] Lentsch, Tr. 692:6–12; Pl.'s Ex. 300 at 2–4, 12, 19.

[49] Pl.'s Ex. 276 at 4 ("The cessation of juvenile fish stocking in the late 1930's may have been a contributing factor to the regional decline in steelhead numbers.").

[50] Barnett, Tr. 187:3–9; Pl.'s Ex. 4 ("[I]t is regrettable that such fine steelhead may be decimated due to low water conditions . . . ."); Joint Ex. 2 ("It is true that the stream section of Coyote Creek has undoubtedly not contained a steelhead run for several years."); Pl.'s Ex. 274 at 4, 22 ("Historical records from the 1940's and 1950's indicate that during the construction of the Ventura River Project, regional population levels of steelhead were in steady decline.  This decline is independent of the Robles operations, and reflects larger factors at work in the species' population dynamics than simply the construction of this project." (citation omitted)).

> In initial discussions with [California Fish and Game] regarding provision
> for fish at various Ventura River Project features, they suggested inclusion
> of a single inexpensive two-step fish ladder at Robles Diversion Dam on
> Ventura River. Their suggestion was premised on the possibility that future
> climatic changes might result in Ventura River stream flows conducive to
> the reestablishment of the steelhead fishery there.[51]

19.     But since everyone at the time believed a fish ladder might not ever be

utilized, California Fish and Game and Reclamation determined that there was no need to

include a fish ladder facility as a feature in the original Robles Diversion Dam.[52]  Instead,

California Fish and Game suggested that Casitas consider building a fish ladder only if

water conditions in the Ventura River changed so as to support a steelhead population:

> [W]e [California Fish and Game] believe that a fish ladder over this dam
> will not be required if the Ventura River Municipal Water District [now
> Casitas] will agree to install a ladder if water conditions in the future should
> be such that fish passage would be required.[53]

20.     Water conditions in the Ventura River have not changed in terms of the

ephemeral nature of the River or in terms of water quality to support a steelhead

population.[54]  And climate changes have not produced flows that have reestablished

steelhead in the Ventura River.  Indeed, since construction was completed on the fish

passage facility in February 2005, fewer than 20 steelhead have used the ladder.[55]

According to the Government's witness, Peter Moyle, "[w]hether [the 2003 Biological

---

[51] Pl.'s Ex. 21 at 1.
[52] Barnett, Tr. 189:1–5.
[53] Joint Ex. 6; *see also* Pl.'s Ex. 21 ("While [Casitas is] very much interested in the preservation of existing fisheries and in the establishment of the best possible fishery at Casitas Reservoir, we are inclined to agree with the Bureau of Reclamation representatives that $25,000 is a sizeable sum to expend on facilities that may never be utilized. . . . [California Fish and Game] suggested that a more practical procedure might be to be omit the fish ladder, but incorporate provisions in the initial construction for the later addition of this facility when and if actual stream conditions indicate its need."); Joint Ex. 5; Joint Ex. 7; Joint Ex. 8.
[54] Barnett, Tr. 189:6–9; Pls. Ex. 274 at 8–9.
[55] Baldrige, Tr. 494:4–11.

Opinion operating criteria] keeps them [the steelhead] in good condition will depend on how well the steelhead population recovers in the next ten to twenty years."[56]

**The 1956 Ventura River Project Contract**

21.    On March 7, 1956, Casitas (then named "Ventura River Municipal Water District") entered into an agreement with the United States for the construction and operation of the Ventura River Project[57] and for the repayment of the costs of construction.  Article 5 of this contract provides that Casitas would repay to the United States the actual reimbursable cost of constructing the Project, not to exceed $27.5 million.  On November 5, 1957, the contract was amended to state:  "The District agreed to repay to the United States the actual reimbursable construction cost, but not in excess of Thirty Million, Nine Hundred Thousand Dollars ($30,900,000), incurred by the United States in providing the project works . . . ."[58]  Neither the 1956 contract nor the amended contract contains any discussion of a fish passage facility.

22.    Article 4 of the 1956 contract provides that:

> [s]ubject to the satisfaction of vested rights and compliance by the District with the terms of this contract, the District shall have the perpetual right to use all water that becomes available through the construction and operation of the Project, and the United States shall, during the time that the project works are being operated and maintained by the United States, deliver water from the project works in accordance with the requests of the District.[59]

---

[56] Moyle, Tr. 3042:8–20.
[57] Joint Ex. 79.
[58] Joint Ex. 9 at 2.
[59] *Id.* at 5 art. 4.

23.     Article 18 also provides that "[t]itle to the project works constructed by the United States pursuant to this contract shall be and remain in the name of the United States until otherwise provided for by the Congress, notwithstanding the transfer hereafter of any such works to the District for operation and maintenance."[60]

24.     Article 7 provides that Casitas will take over operation and maintenance of the Ventura River Project facilities:

> [T]he United States shall transfer to the District the operation and maintenance of the project works and real and personal property used or useful for operation and maintenance of the Project and owned by the United States in connection with the Project.[61]

25.     The 1956 contract further provides that Casitas must operate and maintain the Project at its own expense:  "The District shall take over and at its own expense operate and maintain the project works or any part thereof described in a transfer notice to be furnished to the District by the Secretary."[62]

26.     Finally, the contract also provides that Reclamation makes the rules and regulations for the operation of the Ventura River Project, including the operational criteria for the Robles Dam:

> The District agrees to accept, upon the effective date of the transfer notice, the care, operation and maintenance of the transferred works and thereafter, without expense to the United States, to care for, operate and maintain the transferred works and any existing works of the District and deliver water therefrom in full compliance with the Federal reclamation laws, the terms of this contract, and in accordance with reasonable regulations furnished by the contracting officer and in such manner that said works shall remain in as good and efficient condition, except for normal depreciation and wear,

---

[60] *Id.* at 19 art. 18.
[61] *Id.* at 11–12 art. 7(a).
[62] *Id.* at 12 art. 7(a).

13

for the development, diversion, and distribution of the aforesaid water supply.[63]

## The Casitas Water Right

27.     Casitas and not Reclamation holds the exclusive and perpetual right to divert, store, and deliver all of the water of the Ventura River Project (subject only to prior existing rights) for municipal, domestic, irrigation, industrial, recreational, and backup emergency uses,[64] but that

> [t]he total amount of water to be taken from the sources (direct diversion plus collection to storage) shall not exceed 107,800 acre-feet per year.  The total amount of water to be placed to beneficial use (direct diversion plus withdrawal from storage) shall not exceed 28,500 acre-feet per year.[65]

28.     Although Casitas' license authorizes it to divert 107,800 acre-feet per year from the Ventura River and Coyote Creek, there are many years when little or no water is available for diversion at Robles and most of the water needed to supply Casitas' customers must be taken from Lake Casitas reservoir storage.[66]

29.     Casitas holds Permit No. 10364 from the California State Water Resources Control Board ("State Water Board") to divert water from the Ventura River and Coyote Creek since May 10, 1956 and Reclamation did not obtain any water permit.  Based on proof that the Ventura River Project facilities had been completed and that Casitas had put the water to beneficial use, on January 17, 1986, the State Water Board issued Casitas

---

[63] Joint Ex. 79 at 12 art. 7(a).

[64] *Id.* at 5 art. 4; *see also* Joint Ex. 12 at 1.  *See generally* Wickstrum, Tr. 871:4–7; Coultas, Tr. 57:2–6.

[65] *See* Joint Ex. 12 at 1, License for Diversion and Use of Water, Permit No. 10364, License No. 11834 (Jan. 17, 1986) (license for operation of the Robles Diversion Dam); *see also* Pl.'s Ex. 39, License for Diversion and Use of Water, Permit No. 7601, License No. 10133 (May 31, 1973) (license for operation of the Matilija Dam).

[66] *See* Barnett, Tr. 166:8 to Tr. 167:6.

14

License No. 11834 on that permit.[67]  Casitas, and thus not Reclamation, holds an

appropriative right to a specific quantity of water under the State Water Board's license.

That license grants Casitas the right to take from all sources (direct diversion from the

Ventura River and natural inflow from Coyote Creek) 107,800 acre-feet of water per year

and to put up to 28,500 acre-feet of water to beneficial uses—municipal, domestic,

irrigation, industrial, recreational, incidental power, and standby emergency use.[68]

30.     In addition, Casitas holds License No. 10133, which grants Casitas the right

to divert water from Matilija Creek for irrigation, domestic, and municipal uses.  This

license allows Casitas to store water behind Matilija Dam for release, when necessary, to

augment flows at the Robles Diversion Dam.[69]

**The 1959 Operating Criteria**

31.     From 1959 until NMFS issued the Biological Opinion in 2003, Casitas

operated the Robles Diversion Dam under criteria established by Reclamation, known as

the 1959 trial operating criteria.[70]  Under Reclamation's 1959 trial operating criteria,

Casitas was required to allow the first 20 cubic feet per second ("cfs") in the Ventura

River to flow downstream to senior water rights holders before it could divert any water

out of the River.[71]  In short, 20 cfs of flow in the Ventura River was Casitas' baseline

for diversions.[72]

---

[67] Joint Ex. 12 (license for operation of the Robles Diversion Dam).
[68] Joint Ex. 12 at 1; *see also* Coultas, Tr. 57:1–23; Barnett, Tr. 165:10 to Tr. 166:2.
[69] Pl.'s Ex. 39 (license for operation of the Matilija Dam).
[70] Barnett, Tr. 159:7–25; Joint Ex. 11; *see also* Joint Ex. 48.
[71] Joint Ex. 11 at 3; *see also* Barnett, Tr. 160:1–19.
[72] Barnett, Tr. 160:20–24.

32.     The average diversion at Casitas is about 11,600 acre-feet per year.  This amounts to about 12 days of full diversion per year, since the Robles-Casitas Canal operating at full capacity can divert about 1,000 acre-feet per day.[73]  Of course, on most days there is little or no diversion.  On average, Casitas diverts fewer than 100 days a year.[74]  And there are years when Casitas cannot divert much water at all, and other years where large amounts of water can be diverted.[75]  When there is not enough water for Casitas to divert from the Ventura River, the water level in Lake Casitas drops because Casitas must still deliver water to its customers even if it cannot divert.[76]

33.     Lake Casitas also loses water because of evaporation.  The rate of evaporation depends on how full the Lake is—the greater the Lake area, the greater the evaporation (i.e., greater evaporation in hotter and drier weather).[77]  On average, with rainfall replenishing Lake Casitas, the average evaporation rate is about 5,400 acre-feet per year.[78]

34.     Casitas serves as a backup water source for farmers who use the Ojai Basin groundwater for irrigation because their groundwater well supplies dry up after a few years of consecutive drought, and other water districts.[79]  Mr. Coultas, for instance, testified that Casitas sells about 5,000 acre-feet of water for agricultural use in wetter

---

[73] Barnett, Tr. 158:4–8.
[74] Barnett, Tr. 158:11–15.
[75] Barnett, Tr. 167:1–6.
[76] Word, Tr. 362:8–17.
[77] Barnett, Tr. 166:5–9.
[78] Barnett, Tr. 161:7–16.
[79] Coultas, Tr. 52:3 to Tr. 55:24; Wickstrum Tr.792:13–21.

years and about 10,000 acre-feet of water for agricultural use in drier years.[80]  Casitas also serves as a backup water supply for the city of Ventura because the Ventura River Basin groundwater (the city's other source of water) is shallow and quickly dries up during a drought period, leaving city without other supplies.[81]  Casitas also supplies backup water to 13 different neighboring water agencies when their aquifers run dry.[82]  In dry years, the demand for water dramatically shifts to Casitas because it is the only source of backup water in the area.[83]  But in wet years, demand for Casitas' water goes down considerably because Casitas' customers have access to other sources of water.

35.    Unlike the adjacent Ojai River Basin, which is bowl-shaped, the Ventura River Basin is a water slide, meaning the bedrock underneath the aquifer is tilted downhill so that the groundwater flows quickly down to the ocean.[84]  So during a dry cycle the Ventura River Basin will drain in two to three years.[85]  In addition, the Ventura River Basin is relatively shallow and the water levels drop quickly when the Basin is not being replenished from rainwater.  Once it drops, Casitas' customers who rely on well water must turn to Casitas for water.[86]

36.    And during drought years, the city of Ventura takes almost twice as much water from Casitas as it does in wetter years.[87]  Casitas has a contract with the city of

---

[80] Pl.'s Ex. 393 at B1–B2; Coultas, Tr. 55:21–24; Wickstrum, Tr. 792:5–12.
[81] *See* Pl.'s Ex. 393 at B2–B4; Wickstrum, Tr. 792:5–12; Wickstrum, Tr. 825:20 to Tr. 826:5.
[82] Wickstrum Tr.792:13–21.
[83] Barnett, Tr. 162:10 to Tr. 163:15.
[84] Coultas, Tr. 109:13–25; Coultas, Tr. 110:8–14; Barnett, Tr. 163:8 to Tr. 164:20; Joint Ex. 15 at 27 (unnumbered) (see Figure 9) (also referenced as Pl.'s Ex. 50 in the trial transcript).
[85] Barnett, Tr. 163:8–9.
[86] Word, Tr. 363:7–14
[87] Coultas, Tr. 59:12–24.

Ventura that requires a delivery of a minimum of 6,000 acre-feet and a maximum of 8,000 acre-feet.[88]   Currently, the city takes close to the minimum, but the city plans to expand in the area that is covered by Casitas' water and therefore water demand from the city will increase.[89]

**Safe Yield Calculation**

37.     Understanding the concept of safe yield is crucial to any analysis of water supply.  Engineers design water projects, such as the Ventura River Project, to yield a specified water supply—safe yield—each year without running dry, even during the most critical drought on record.[90]  So water-thirsty districts, like Casitas, manage their water supplies prudently so that annual deliveries do not exceed the safe yield of the project.[91]

38.     Reclamation defines safe yield as the firm annual yield of water available over the longest, most critical dry period in history, under the most critical sedimentation conditions that occur at the end of a recovery period.[92]  Likewise, the U.S. Army Corps of Engineers defines safe yield as:

> The safe yield provided by a reservoir is usually defined as the annual flow delivered by the project without causing intolerable shortages under recurrence of historical droughts.  In the case of municipal and industrial (M&I) supplies, it is usual practice to permit no shortages and in some cases even to provide a reserve storage in the event of droughts that exceed the worst of record.[93]

---

[88] Pl.'s Ex. 187; Pl.'s Ex. 393 at B2–B4; Wickstrum, Tr. 1155: to Tr. 1156:6.
[89] Word, Tr. 378:11 to Tr. 379:1; Coultas, Tr. 59:9–11; Wickstrum, Tr. 1155:3 to Tr. 1156:6.
[90] Barnett, Tr. 167:13–19.
[91] Barnett, Tr. 174:5–11.
[92] Barnett, Tr. 167:13–19.
[93] Pl.'s Ex. 36 at 10.

39.     As noted geologist and hydrologist, Dr. Tormey, testified, most definitions of safe yield also assume that the driest period on record could be followed by an even drier period.[94]   In practical terms, safe yield is the amount of water that Casitas can safely deliver to its customers during a drought period without Lake Casitas running dangerously low.[95]

40.     Over the years, Reclamation has twice calculated safe yield for the Ventura River Project.  In the original 1954 feasibility study for the Project, Reclamation calculated the safe yield as approximately 28,500 acre-feet per year, based on a critical drought period of 1918 through 1936.[96]

41.      Subsequently, Reclamation realized that the period of 1944 to 1965 was a more severe drought period than the 1918 to 1936 period.  So in 1968, Reclamation recalculated the safe yield.  Based on the new critical drought period information, Reclamation reduced the safe yield to 20,350 acre-feet per year to make certain that Lake Casitas could withstand the new most-critical-drought-period on record (1944–1965).[97]

42.     Most recently, in 1989 Richard Barnett, an engineer with Casitas, in conjunction with the engineering firm of Murray, Burns, and Kienlen, revisited the safe yield calculation, using methods similar to those used by Reclamation in determining the earlier safe yield calculations.[98]

---

[94] Pl.'s Ex. 269 at 3–4.
[95] Barnett, Tr. 167:21–23.
[96] Joint Ex. 3 at 1; Pl.'s Ex. 12 at 4, 9, 13, 18; Pl.'s Ex. 13 at 9 ¶ 14.
[97] Joint Ex. 15 at 2 (also referenced as Pl.'s Ex. 50 in the trial transcript); Barnett, Tr. 171:12 to Tr. 172:3; Barnett, Tr. 173:3–22.
[98] Joint Ex. 15; Joint Ex. 13; Barnett, Tr. 175:2–16; Barnett, Tr. 177:5–14; Barnett, Tr. 177:12–14; Barnett, Tr. 181:14 to Tr. 182:18.

43.     Finding that Reclamation had overestimated the amount of evaporation from Lake Casitas in the 1968 safe-yield calculation and failed to account for the refill period for Lake Casitas during the wet period (1966 to 1980), Barnett and Kienlen revised Reclamation's calculation and determined the safe yield of the Ventura River Project to be 21,500 acre-feet.[99]  21,500 acre-feet has been Casitas' safe yield ever since the 2003 Biological Opinion operating criteria were imposed.[100]

44.     Because Casitas attempts to avoid delivering more water than the safe yield, Lake Casitas has never run dry, although in some years Casitas has been forced to deliver more water than its safe yield (and in other years less).  In 1986, for instance, Lake Casitas was full at 254,000 acre-feet.[101]  But only four years later, Lake Casitas was reduced to half its storage capacity.[102]  If Casitas were forced to deliver water from the bottom of the reservoir, the costs of pumping the water and the logistics associated with pumping water from the lower reaches of the reservoir would be significant.[103] Wickstrum also testified that there could be significant water quality concerns and costs if the reservoir were drawn down significantly.[104]

**The Listing of the Steelhead Trout as Endangered**

45.     On August 18, 1997, NMFS listed the Southern California evolutionary significant unit ("ESU") of west coast steelhead trout (*Oncorhynchus mykiss*) as an

---

[99] Joint Ex. 15 at 3; Joint Ex. 13; Barnett, Tr. 178:7–16; Barnett, Tr. 179:1–6.
[100] Barnett, Tr. 179:11–14.
[101] Barnett, Tr. 175:16–22.
[102] *Id.*
[103] Wickstrum, Tr. 813:20 to Tr. 814:17.
[104] Wickstrum, Tr. 814:15–23.

endangered species.[105]

46.     The final rule promulgated by NMFS identified five ESUs of west coast

steelhead trout in four states that warranted being listed as threatened or endangered

species under the ESA.[106]   One of these was the Southern California ESU, which

encompassed the Ventura River.[107]   Historically, steelhead occurred naturally south into

Baja California.  Estimates of historical (pre-1960s) abundance for several rivers in this

ESU were available, and indicated that in the Ventura River, there were only 4,000 to

6,000 steelhead trout present prior to 1960.[108]

47.     At the time the steelhead trout was listed as endangered, it was estimated

that there were fewer than 200 adult steelhead in the Ventura River.[109]

48.     On November 25, 1996, Reclamation, as owner of the Ventura River

Project, notified Casitas that a listing of the steelhead trout as endangered would impact

the operations of the Ventura River Project, and suggested a Section 7 consultation:

> The National Marine Fisheries Service (NMFS) is currently considering
> listing the west coast steelhead as a threatened or endangered species
> pursuant to the Endangered Species Act (ESA).  Such a listing may require
> that the Ventura Project be operated differently than it is currently being
> operated.  In anticipation of that action, the Bureau of Reclamation
> (Reclamation) and the Casitas Municipal Water District (Casitas) are
> jointly reviewing the impacts of the Ventura Project on the west coast
> steelhead.  If that species is listed, Reclamation and Casitas intend to

---

[105] Joint Ex. 78, Endangered and Threatened Species: Listing of Several Evolutionary Significant Units (ESUs) of West Coast Steelhead, 62 Fed. Reg. 43,937 (Aug. 18, 1997) (codified at 50 C.F.R. pts. 222, 227).
[106] *Id.*
[107] *See id.*
[108] *Id.* at 43,949.
[109] *Id.*

discuss such impacts with the NMFS to attempt to eliminate or mitigate any detrimental impacts of the Project on that species.[110]

**NMFS Prescribed the Operational Criteria that Takes Casitas' Water**

49.     Under the ESA, NMFS is responsible for the protection of anadromous species, such as the California steelhead trout.[111]  The listing of the steelhead on December 18, 1999, triggered these protections and brought the steelhead under NMFS' jurisdiction.[112]  Simply put, if the steelhead had not been listed as an endangered species there would not have been Section 7 consultation between NMFS and Reclamation.[113]  In fact, Reclamation's ownership and control over the operation of the Ventura River Project made consultation under Section 7 of the Endangered Species Act mandatory.[114] Under the existing contract, Reclamation must approve any alteration of the facilities for the Ventura River.[115]

50.     At the outset of the consultation in 1999, NMFS made clear that preparation of the Biological Assessment and Biological Opinion must proceed in accordance with NMFS' regulations and guidance.  NMFS sent Casitas guidance in developing a solicitation for a proposal to hire contractors to design the fish ladder and fish screen, and a list of contractors who were experienced in designing a fish screen

---

[110] Pl.'s Ex. 63 at 1.

[111] Joint Ex. 78; 16 U.S.C. § 1533.

[112] Joint Ex. 78.

[113] Jackson, Tr. 1829:6–9.

[114] *See* 16 U.S.C. § 1536(a); 50 C.F.R. § 402.01 ("Section 7(a)(2) of the Act requires every Federal agency, in consultation with and with the assistance of the Secretary, to insure that any action it authorizes, funds, or carries out, in the United States or upon the high seas, is not likely to jeopardize the continued existence of any listed species or results in the destruction or adverse modification of critical habitat.").

[115] Jackson, Tr. 1841:10–14.

system.[116]  In accordance with NMFS' procedures, Casitas sent out a request for

proposals to several of the NMFS-listed contractors,[117] and ultimately retained one of the

engineering firms—Borcalli and Associates—from the NMFS list.[118]  In turn, Borcalli

and Associates subcontracted with Entrix—an environmental consulting firm—to assist

with the biological and hydrological components of the fish passage facility.[119]

51.     NMFS also provided Casitas with extensive oversight, directed the design

of the fish passage facility, and told Casitas that the fish passage facility must be based on

the functional design described in the NMFS guidance document, unless NMFS approved

changes from the guidance documentation.[120]  That guidance included discussion of what

fish passage flows would be required:  sufficient flow to make sure the ladder was

operational, sufficient flow for migrating fish to detect the ladder, and sufficient flow

below the ladder to allow fish to use the ladder.[121]  NMFS also provided guidance on the

characteristics that must be included in a fish passage facility:

> For projects where NMFS has jurisdiction, such as FERC license
> applications and ESA consultations, a functional design must be developed
> as part of the application or consultation.  These designs must reflect
> NMFS design criteria and be acceptable to NMFS.  Acceptable designs
> typically define type, location, method of operation, and other important
> characteristics of the fish screen facility.  Design drawings should show
> structural dimensions in plan, elevation, and cross-sectional views, along
> with important component details.  Hydraulic information should include:
> hydraulic capacity, expected water surface elevations, and flows through
> various areas of the structures.  Documentation of relevant hydrologic
> information is required.  Types of materials must be identified where they

---

[116] Lecky, Tr. 1633:13 to Tr. 1634:4; Attachment 2 to Joint Ex. 27.
[117] Lecky, Tr. 1675:20–24; Joint Ex. 28.
[118] Wickstrum, Tr. 880:1–6; Wickstrum, Tr. 996:9–24; Lecky, Tr. 1676:2–7.
[119] *See* Baldrige, Tr. 445:5 to Tr. 447:11; Lentsch, Tr. 742:15–17.
[120] Lecky, Tr. 1681:2–18.
[121] Lecky, Tr. 1635:15–24

will directly affect fish. A plan for operations and maintenance procedures should be included—i.e., preventive and corrective maintenance procedures, inspections and reporting requirements, maintenance logs, etc.—particularly with respect to debris, screen cleaning, and sedimentation issues. The final detailed design shall be based on the functional design, unless changes are agreed to by NMFS.[122]

52.     Jim Lecky, the Director of the Office of Protected Resources for NMFS, is specifically charged with the responsibility for establishing policy and guidance for the regional offices to insure consistency in implementing Section 7 consultations. At trial, he confirmed that NMFS must review and approve the fish passage design as being in accordance with NMFS' criteria before NMFS will certify construction:

> Q. Okay. Now, the first sentence of the paragraph here at the bottom says that these criteria apply in areas where NMFS has jurisdiction, such as Endangered Species Act consultations, right?
> A. That's correct.
> Q. Okay. And in such consultations, NMFS isn't going to approve a fish screen that doesn't meet NMFS's approval, are they?
> A. Yes, sir, that's right.[123]

53.     The Federal Circuit's opinion on appeal aptly summarizes the Section 7 consultation that culminated in the issuance of the Biological Opinion in 2003:

> In August, 1997, almost forty years after the construction of the project, the National Marine Fisheries Service (NMFS) listed the West Coast steelhead trout as an endangered species in the Project watershed. . . . To avoid ESA section 9 liability, the Bureau of Reclamation (BOR) sought a biological opinion by the NMFS (BiOp) pursuant to section 7 of the ESA. For the purposes of this appeal, the government concedes that the BOR's May 2, 2003 directive advising Casitas that it was obligated to comply with the requirement of the BiOp compelled Casitas to:  (1) construct a fish ladder facility, which is located at the intersection of the Ventura River, Robles Diversion Dam, and the Robles-Casitas Canal; and (2) divert water from the Project to the fish ladder, resulting in a permanent loss to Casitas

---

[122] Attachment 2 to Joint Ex. 27 at 2.
[123] Lecky, Tr. 1681:2–18.

of a certain amount of water per year.   Under protest Casitas complied . . . .[124]

54.    On March 31, 2003, NMFS issued its Biological Opinion prescribing a new flow regime for the Ventura River.[125]  NMFS' 2003 Biological Opinion operating criteria require Casitas to allow the first 50–171 cfs of Ventura River water to flow through the fish passage facility and downstream to the Pacific Ocean before Casitas can divert any water for its own use.[126]  The NMFS Biological Opinion states:

> The *minimum* flow rate providing successful steelhead migration through the lower river is 50 cfs.   Therefore downstream released flows at the diversion must be maintained at or above 50 cfs during the first 10 days of each migratory storm event . . . .[127]

The 2003 Biological Opinion concluded that construction of the fish passage facility as designed, together with a new set of operating criteria to facilitate upstream and downstream passage of the fish, were necessary to avoid jeopardy to the species.[128]

55.    NMFS biologist Frederick Rogers testified that he was the author of the 50 cfs flow regime that NMFS prescribed in the 2003 Biological Opinion.[129] Rogers first set out that flow regime in an October 28, 2002 letter he authored for Rodney R. McInnis, Acting Regional Administrator for NMFS.[130]  That letter sets forth NMFS' preferred operational scenario for the Robles Diversion Dam:

> This letter memorializes the main points of the National Marine Fisheries Service's (NOAA Fisheries) preferred operational scenario for the proposed

---

[124] *Casitas*, 543 F.3 at 1282 (citation and footnote omitted).
[125] Joint Ex. 48.
[126] *Id.* at 7–8.
[127] *Id.* at 7.
[128] *Id.*
[129] Rogers, Tr. 1971:2–5.
[130] Joint Ex. 42; Rogers, Tr. 1971:6–10.

Robles Fish Ladder as outlined at the October 15, 2002, meeting at the U.S. Bureau of Reclamation (BOR) Office in Fresno, California.

NMFS' "preferred operational scenario" sets forth the minimum flow that Casitas must maintain through the fish passage facility is 50 cfs:

> Minimum fish migration flow:  The *minimum* flow rate providing successful steelhead *(Oncorhynchus mykiss)* migration through the lower river is 50 cfs.  Therefore, downstream released flows at the diversion must be maintained at or above 50 cfs during the first 10 days of each migratory storm event.[131]

56.    As Rogers testified:

> Q.  Okay.  Now, that biological opinion contains essentially the flow regime that you also wrote in the October 28th, 2002 letter, Joint Exhibit 42; is that right?
> A.  Yes, I believe so.[132]

Rogers also testified that he required the 50 cfs in the 2003 Biological Opinion operating criteria because he believed that the 1959 trial operating criteria of 20 cfs was causing harm to the steelhead trout (a possible "take" under the Endangered Species Act):[133]

> Q.  All right.  In February of 2003, you said to Casitas operating under the 1959 criteria is causing harm to the fish, right?
> A.  Yes.
> Q.  So does it follow that they had to change their operating criteria in order to avoid harm to the fish?
> A.  I had documented that it was likely that harm was occurring from their previous operations, and so I guess it stands to reason that to avoid that harm that they would have to do something different than that.
> Q.  Okay.  So that is a yes to my question; is that correct?
> A.  I assume so.
> Q.  Okay.  And the flow regime that you proposed in October of 2002, and which you then included in the biological opinion, was intended to avoid that harm was it not?

---

[131] Joint Ex. 42 at 1.
[132] Rogers, Tr. 1971:6–10.
[133] *See* 16 U.S.C. § 1533.

A.  Yes.[134]

57.     Casitas did not agree to the 50 cfs flow regime that NMFS included in its

2003 Biological Opinion and instructed Jean Baldrige, Casitas' fish biologist, to propose

a 20 cfs-flow regime in the draft Biological Assessments that she submitted to NMFS on

December 15, 2000, September 14, 2001, and November 12, 2001.[135]

58.     NMFS rejected each of the draft Biological Assessments proposed by

Casitas as inadequate to protect the steelhead, each time commenting that the Robles

facility must operate with higher bypass flows.[136]

59.     For example, in a April 13, 2001 e-mail to David Young of Reclamation,

Darren Brumback of NMFS commented on the draft Biological Assessment by stating

that the 20 cfs proposed flow regime might result in a jeopardy opinion:

> In reviewing the proposed operations and baseline conditions, I  expressed
> concern and recommended that they revise the proposed operation lo [sic]
> focus on the "attraction" passage flows (shape of hydrograph & duration of
> receding limb in response to storm events) in addition to the recommended
> "minimum physical" passage flow.  Essentially I expressed that my initial
> review of the proposal suggested that the proposed operations could result
> in a jeopardy opinion.[137]

60.     In the November 2001 draft Biological Assessment, Casitas again proposed

a bypass of 20 cfs.[138]  NMFS biologist Rogers drafted another letter for McInnis stating

NMFS' flow requirements:

---

[134] Rogers, Tr. 1977:23 to Tr. 1978:17.
[135] Pl.'s Exs. 95, 102, 104A (respectively); Pl.'s Ex. 274 at 19–20; Baldrige, Tr. 484:7–11; Baldrige,
Tr. 488:20 to Tr. 489:1.
[136] Jackson, Tr. 1838:15 to Tr. 1839:2; Jackson, Tr. 1840:21–25.
[137] Pl.'s Ex. 98 at 1.
[138] Pl.'s Ex. 104A; Rogers, Tr. 1917:10–14.

A minimum migration flow of 40 – 65 cfs was determined using a modified version of the Thompson Method (Thompson 1972). This method probably underestimates flow needs because the method was not designed for low gradient, braided stream channels such as occur in the middle and lower reaches of the Ventura River. The current and proposed downstream diversion release of 20 cfs for river flows less than 520 cfs is therefore inconsistent with the analysis, and NMFS believes is inadequate to ensure successful upstream steelhead migration. NMFS strongly recommends that proposed downstream flow releases from the Robles Diversion and fish passage facilities be maintained at levels above 40 cfs for the entire migration window identified for migrating steelhead. Based upon the results of the Entrix study, migratory flows should be closer to the upper limit (i.e., 65 cfs) to ensure adequate passage through all reaches of the lower river below the Robles Diversion, particularly those reaches with multiple channels where migrating steelhead must contend with reduced flow depth and channel width, and increased exposure to predation.[139]

61.    Thus, throughout the informal and formal Section 7 consultation, Casitas, working through Entrix, attempted to convince NMFS that less water was required for operating the fish ladder.[140] Entrix also requested that NMFS provide scientific support for its claim that the steelhead required the higher flows that NMFS was demanding.[141] Entrix never received that data from NMFS.[142]

62.    Two members of the Casitas Board of Directors attended many of the meetings with NMFS to discuss the steelhead situation and testified that they felt they had no choice but to comply with NMFS' 50 cfs flow regime. Board member Jim Coultas testified:

[I]n the event that we didn't give National Marine Fishery Service exactly what they wanted, they would give us a jeopardy opinion. And that would mean we could not divert water at all. More than half of our water that we

---

[139] Joint Ex. 38 at 3; Rogers, Tr. 1931:2–25; Rogers, Tr. 1932:11 to Tr. 1933:1–14.
[140] Baldrige, Tr. 460:21 to Tr. 461:1–24; Baldrige, Tr. 470:4–24; Baldrige, Tr. 484:7–11; Baldrige, Tr. 581:19–23; Baldrige, Tr. 582:10–14; Baldrige, Tr. 595:16 to Tr. 596:3.
[141] Baldrige, Tr. 461:2–17.
[142] Baldrige, Tr. 461:18–20.

use is diverted from Robles Diversion Dam, if we couldn't divert at all, suddenly we have half the water our customers need.  So we could not risk the jeopardy opinion.  And they said this is what we need, just swallow hard and take it.[143]

And Board member Jim Word also testified:

There seemed to be no compromise whatsoever.  They were dictating what should be done, how it should be done, and our obligation was to do it.[144]

* * *

[A]fter several public meetings and meetings with [NMFS], we were told that we really had no choice if we wanted to continue diverting, and that meant 40 percent or thereabouts of our water was subject to being lost if we stopped diverting, and that was our choice.  We either built it and managed it to their specifications, or we would be subject to criminal prosecution for violation of the Endangered Species Act, in which case all diversion would cease, and they would start arresting and fining staff.[145]

63.     Soon after NMFS issued its Biological Opinion, the Casitas Board of Directors unanimously adopted a Board Resolution stating that Casitas, in response to the powerfully coercive effect of the ESA, would implement the flow regime prescribed by NMFS in the Biological Opinion only if Reclamation required Casitas to do so.  That Resolution read in part:

WHEREAS, the Biological Opinion requires that Casitas release up to 3,200 acre feet of safe yield in violation of Casitas' agreement with the United States of America and in effect taking the property of Casitas without compensation; and

* * *

WHEREAS, Section 9 of the Endangered Species Act makes it illegal to take endangered species such as the steelhead trout and provides civil and criminal penalties for that take; and

---

[143] Coultas, Tr. 72:4–20.
[144] Word, Tr. 367:12–21.
[145] Word, Tr. 371:17 to Tr. 372:1.

29

WHEREAS, the Biological Opinion dated March 31, 2003, provides that "If Reclamation (1) fails to assume and implement the terms and conditions, or (2) fails to require Casitas to adhere to the terms and conditions of the incidental take statement through enforceable terms that are added to the permit or grant document, the protective coverage of section 7(o)(2) may lapse."; and

WHEREAS, the lapsing of the incidental take statement will subject Casitas to Section 9 of the Endangered Species Act; and

* * *

WHEREAS, Casitas is under a powerful coercive effect to move forward with the fish passage project; and

WHEREAS, Casitas, after being directed by Reclamation, is the action agency that has a Biological Opinion directed at its operation and feels that it has been coerced into following the Biological Opinion;

NOW, THEREFORE, BE IT RESOLVED THAT the Board of Directors directs the General Manager to implement the March 31, 2003 Biological Opinion Authorization for the construction and future operation of the Robles Diversion Fish Passage Facility issued by the National Marine Fisheries Service, Southwest Region, immediately subject to the Bureau of Reclamation requiring Casitas Municipal Water District to adhere to the terms and conditions of the incidental take statement within 30 days or this action is to be brought back to the Board.[146]

64.    In response to the Casitas Board's Resolution, Reclamation sent a letter to

Casitas confirming that Casitas must comply with the non-discretionary terms of the

Biological Opinion (including the flow regime):

In order to be exempt from the Take Provisions of the ESA, non-discretionary terms and conditions have been established in the BO [Biological Opinion] and must be implemented.

The Casitas Municipal Water District operates the Ventura Project on Reclamation's behalf, pursuant to Contract 14-06-200-5257 as amended, and as such must also comply with the Terms and Conditions of the BO.[147]

---

[146] Pl.'s Ex. at 148 at CMWD_1260245–46.
[147] Joint Ex. 49 at 1; *see also* Word, Tr. 376:3–12.

65.     In compliance with Reclamation's May 2, 2003 Order, Casitas constructed the fish passage facility at a total cost of approximately $9.5 million, and implemented the revised operational criteria contained in the Biological Opinion.[148]

**The Decrease in Casitas' Safe Yield Was Not Caused by California State Law or State Action**

66.     Although California has enacted legislation similar to the federal ESA,[149] California has never listed steelhead trout on its endangered species list.[150] Consequently, California Fish and Game has never issued a biological opinion for the Ventura River Project nor required Casitas to build a fish ladder.[151]

67.     One of the responsibilities of California Fish and Game is to petition the State Water Board to amend water licenses for the protection of fish.[152]  Yet from the time that the Ventura River Project was completed in 1958 to today, California Fish and Game has never petitioned the State Water Board for an amendment of Casitas' license at the Ventura River Project.[153]

68.     With respect to the Robles Diversion Dam, California Fish and Game has never filed an enforcement action, nor has it taken any regulatory or administrative action to limit Casitas' water license for the protection of the steelhead trout.[154]

---

[148] Coultas, Tr. 72:21–23.
[149] Week, Tr. 1319:25 to Tr. 1320:16.
[150] Week, Tr. 1305:1–3; Week, Tr. 1320:17 to Tr. 1321:13.
[151] Week, Tr. 1321:14–19.
[152] Week, Tr. 1326:9–17.
[153] Week, Tr. 1325:18 to Tr. 1326:8.
[154] Week, Tr. 1326:14 to Tr. 1328:3; Week, Tr. 1325:18 to Tr. 1326:8; Week. Tr. 1327:8–25.

69.     On December 31, 2004, an environmental group, California Trout, filed a petition with the State Water Board asking the State Water Board to amend Casitas' license "to conform with the new operational criteria prescribed in the March 31, 2003 Biological Opinion . . . ."[155]  In a subsequent letter to the State Water Board, California Trout expanded its request to ask the State Water Board to hold a public hearing on all of Casitas' diversions, arguing that  "the public trust doctrine requires a higher standard of protection than the Endangered Species Act"[156] and stating California Trout's opinion that the Biological Opinion flow requirements "are a starting point for the Board's decision how to amend this license to protect all trust resources, not just the listed steelhead fishery."[157]

70.     But the State Water Board rejected California Trout's petition to amend Casitas' water right license "to conform with the new operational criteria prescribed in the March 31, 2003 Biological Opinion . . . ."[158]  Likewise, the Board indicated that to hold a hearing on Casitas' trust responsibilities with respect to the steelhead or any other trust responsibilities "would not be a judicious use of the Division of Water Right's (Division) scarce resources."[159]

71.     Other than this petition by California Trout in 2004, there have been no other petitions filed with the State Water Board regarding Casitas' water license to the Robles Diversion Dam.

---

[155] Def.'s Ex. 145 at 1.
[156] Def.'s Ex. 171 at 1 (referencing Def.'s Ex. 164).
[157] Def.'s Ex. 164 at 3.
[158] Def.'s Ex. 145 at 1–2; *see also* Def.'s Ex. 171 at 1 (concluding that "CalTrout's complaint is not warranted at the present time").
[159] Def.'s Ex. 171 at 1.

72.     The State of California has never taken any action at all against Casitas'

water rights license or its operations relating to the protection of the steelhead trout.[160]

**Operation of the Robles Diversion Dam Has Not Impaired the Good Condition of the Steelhead Trout**

73.     Historical records from the 1940s and 1950s indicate that a regional decline

in steelhead populations occurred because of a significant drought that began in the

1940s.[161]   Further decline resulted from the construction of the Matilija Dam,

construction that was completed in 1947, well before the Robles Dam was built.[162]

Historical accounts and correspondence demonstrate that the severe population decline of

the steelhead in the Ventura River occurred before the construction of the Ventura

River Project.[163]

74.     Section 5937 of the California Fish and Game Code requires that dam

owners provide sufficient water to keep "in good condition" any fish that may be planted

or exist below the dam.[164]   Moyle and Baldrige agree that steelhead in the Ventura River

are in good condition at the individual level.[165]   Both also agree that steelhead in the

Ventura River are not presently in good condition at the population or community

level.[166]   By population levels, Moyle and Baldrige refer to all the steelhead in the

Ventura River, while community level includes all populations in all the rivers in

---

[160] Barnett, Tr. 189:10–16; Coultas, Tr. 79:12–24; Week, Tr. 1327:17–25.
[161] Pl.'s Ex. 274 at 22; Moyle, Tr. 3046:8 to Tr. 3047:8.
[162] Baldrige, Tr. 525:16–18; Moyle, Tr. 2958:25 to Tr. 2959:8.
[163] Pl.'s Ex. 276 at 5–7.
[164] Cal. Fish & Game Code § 5937.
[165] Pl.'s Ex. 274 at 5, 26; Baldrige, Tr. 624:5 to Tr. 625:2; Moyle, Tr. 2017:10–20; *see also* Joint Ex. 72.
[166] Pl.'s Ex. 274 at 5, 26; Def.'s Ex. 233 at 34; Baldrige, Tr. 626:25 to Tr. 627:3; Baldrige, Tr. 627:15 to Tr. 628:21; Moyle, Tr. 3017:20–21.

southern California.[167]  The Ventura River steelhead have not been in good condition at

the population and community levels since before the Ventura River Project, which is

why California Fish and Game and Reclamation determined not to include a fish ladder

in the original project.[168]  Moyle and Baldrige also agree that the population is affected

by a myriad of factors including habitat degradation, and that the community level

assessment is affected by the species introduced into the River, as well as the low

numbers of steelhead.[169]

75.     Baldrige further testified that

[o]perations at Robles Diversion have had much less of an impact on
steelhead.  During the period of the year when Robles Diversion is
operated, the fish, including steelhead, meet the "good condition" criteria
for the individual.  Factors other than Robles Diversion operations are
responsible for steelhead not meeting the criteria for good condition at the
population and community levels.  Many of the factors affecting steelhead
habitat would not be influenced through alterations in flow regimes.  It's a
system with layers of complexity that cannot be resolved by requiring
additional flow releases from Robles Diversion.[170]

76.     But according to Baldrige, Robles Diversion Dam operations have small

effects on steelhead habitat downstream of the diversion when the diversion is

operational.[171]  These effects are not limiting the success of steelhead in the Ventura

River in any significant way.[172]  The most important limiting factor faced by steelhead in

---

[167] Joint Ex. 72.

[168] *See* Joint Ex. 6.

[169] Pl.'s Ex. 274 at 5–6, 26; Def.'s Ex. 233 at 34; Baldrige, Tr. 492:21 to Tr. 500:20.

[170] Pl.'s Ex. 274 at 26.

[171] Pl.'s Ex. 274 at 6, 15; Pl.'s Ex. 270 at 2–7 ("Diversions from the Robles facility to Lake Casitas cannot exceed 500 cfs owing to structural limitations.  In contrast, peak flows on the Ventura River frequently peek at tens of thousand cfs . . . and as such water diversion has little effect on these peak flows.").

[172] Pl.'s Ex. 276 at 11–13; Pl.'s Ex. 270 at 2–7.

34

the Ventura River and in southern California in general is summer/fall habitat.[173]  This is the time when stream flows are low, water temperatures are high, and available habitat is limited.  Robles Diversion is not operating during this period and thus has no effect on the availability of habitat for the steelhead.[174]

**The Annual Decrease in Safe Yield from the 2003 Biological Opinion Operating Criteria is 1,915 Acre-Feet**

77.    Leo Lentsch, Steve Wickstrum, and Dr. Daniel Tormey testified that the proper method of calculating the quantity of water taken in this case is to determine the decrease in safe yield resulting from the change in operations from the 1959 trial operating criteria to the 2003 Biological Opinion operating criteria.[175]

78.    The decrease in safe yield resulting from application of the 2003 Biological Opinion operating criteria is 1,915 acre-feet, as calculated by Leo Lentsch in a report that he (along with Steve Wickstrum) prepared for the Casitas Board of Directors in 2004.[176]  That report, which follows the safe yield methodology, calculated the water supply that would have been available during the critical historic drought period from 1945–1965, and during the recharge period of 1966–1980 (when the reservoir filled) under both the 1959 trial operating criteria and the 2003 Biological Opinion operating criteria.[177]  The report is particularly credible because it was prepared to assist Casitas' Board of Directors in managing Casitas' water supply and not for litigation.[178]

---

[173] Pl.'s Ex. 274 at 17.
[174] Pl.'s Ex. 274 at 17; Pl.'s Ex. 276 at 11–13.
[175] Lentsch, Tr. 668:8–12; Wickstrum, Tr. 857:19–21; Tormey, Tr. 1449:8 to Tr. 1450:2.
[176] Lentsch, Tr. 663:17 to Tr. 664:11.
[177] Lentsch, Tr. 667:25 to Tr. 668:12; Lentsch, Tr. 671:13 to Tr. 673:14.
[178] Lentsch, Tr. 662:22 to Tr. 663:4; Pl. Ex. 393 at 1.

79.     Using a hydrologic routing model, Lentsch calculated that the safe yield

under the 1959 operating criteria would be 22,770 acre-feet during the dry period 1945–

1965, and 24,177 during the wet period 1966–1980.[179]  Using the same model, he

determined that the safe yield under the 2003 Biological Opinion operating criteria would

be 21,630 during the critical dry period and 21,184 for the recovery period.[180]  Lentsch

summarized his findings on the overall reduction in safe yield caused by the application

of the Biological Opinion operating criteria in a table:

**Predicted Project Water Yield Reductions Resulting from
Operational Criteria Changes at Robles Diversion Dam and Fish Passage Facility[181]**

| | Critical Drought Period (1945–65) | Reservoir Recovery Period (1966–80) | Total Hydrologic Cycle (1944–80) |
|---|---|---|---|
| Water yield of Lake Casitas – 1959 Trial operating criteria (in acre feet) | 478,170 | 362,700 | 840,870 |
| Water yield of Lake Casitas – 2003 Biological Opinion operating criteria (in acre feet) | 454,230 | 317,700 | 771,930 |
| Reduction in water yield (in acre feet) | 23,940 | 45,000 | 68,940 |
| Time (in years) | 21 | 15 | 36 |
| Average reduction in yield (in acre feet per year) | 1,140 | 3,000 | 1,915 |

80.     At the request of Casitas, Entrix performed a peer review of the 2004 Water

Supply and Use Study.[182]  Dr. Tormey, who acted as the project director for the peer

---

[179] Lentsch, Tr. 675:10 to Tr. 676:9.
[180] *Id.*
[181] Pl.'s Ex. 257 at 4.
[182] Pl.'s Ex. 256 at 5; Tormey, Tr. 1442:21–24.

review,[183] received his Bachelor's Degree in Civil Engineering and Geology from

Stanford and his Ph.D. in Geology and Geochemistry from the Massachusetts Institute of

Technology.[184]  He routinely participates in complex projects involving the analysis of

hydrology, sediment transport and hydrodynamic transport, and water supply and use

throughout California and the United States.[185]  Dr. Tormey assembled a highly qualified

team to conduct the peer review of Lentsch and Wickstrum's report, including

David Blankenhorn, a registered geologist with over 9 years of experience working on

hydrology projects, Woody Trihey, a civil engineer with experience in supply

infrastructure, and Dr. Gretchen Greene, an economist with experience in

water demand.[186]

81.     The Entrix review team carefully examined Lentsch's water

supply analysis:

> The review of the water supply analysis included an evaluation of the mean
> daily flow data used in the water supply analysis, flow losses and additions
> between the existing stream gauges and the Robles Diversion, estimates of
> storage and release from Matilija Dam, bypass flows at Robles Diversion
> associated with the 1959 and BO operating criteria, losses in the Robles
> Diversion canal, losses at Lake Casitas, and input from tributaries to
> Lake Casitas.[187]

82.     The peer review team concluded that that the 2004 Water Use and Supply

Study followed accepted standards of practice in predicting the reliability of Casitas'

water supply system: "Water supply assumptions and methodology appear sound and

---

[183] Tormey, Tr. 1445:17–18.
[184] Tormey, Tr. 1415:20 to Tr. 1416:3.
[185] Tormey, Tr. 1417:15 to Tr. 1432:4; Pl.'s Ex. 256 at 7–12.
[186] Pl.'s Ex. 177 at 2–3.
[187] *Id.* at 3.

empirical data is used where available to model or validate the water supply under the

different scenarios."[188]  In his expert report, Dr. Tormey commented further on the

appropriateness of the methodology used in Lentsch's supply analysis:

> The planning scenario chosen to predict supply reliability is the longest
> drought on record in the watershed: 1944 to 1965, which is appropriate for
> purposes of determining system reliability.  The study also evaluates the
> recovery period of water levels in the reservoir following the drought
> between 1966 and 1980 to determine safe yield until the reservoir recovers
> to full storage capacity.  These planning scenarios, which consider the
> periods of greatest stress on the water supply, are appropriate for purposes
> of determining system reliability.[189]

The Entrix peer review concluded that the 2004 Study's conclusion that 2003 Biological

Opinion operating criteria would reduce diversions to Lake Casitas by 1,915 acre feet per

year was reasonable.[190]

83.    In addition to Entrix's peer review, MBK Engineers, an engineering firm

specializing in water resources and water rights, conducted a completely independent

peer review of the Lentsch water supply analysis.  Neither of the peer reviewers was

aware of the other, so they worked entirely independently of the other.[191]  MBK

commended Lentsch and Wickstrum on the overall quality of the report and specifically

noted the methodology used by Lentsch in his supply analysis:  "We conclude that,

overall, this is a concise, clearly written report that identifies the key issues of the water

supply and its use by the District."[192]

---

[188] Tormey, Tr. 1447:10 to Tr. 1448:11.
[189] Pl.'s Ex. 256 at 3.
[190] Tormey, Tr. 1447:10 to Tr. 1448:11.
[191] Pl.'s Ex. 176.
[192] *Id.* at 2.

84.     The Government's expert, Curtis Spencer, agreed that safe yield is an important concept for the management of water supplies and that if the 2003 Biological Opinion operating criteria reduces the safe yield in Lake Casitas, the decrease should be taken into account by Casitas in the management of its water supply.[193]  And even though Spencer agreed with the methodology used by Lentsch and Wickstrum to determine the decrease in safe yield, he never did so himself because he was not instructed to do so by the Government. [194]

85.     Although the Government pointed out some math errors in the portion of the report prepared by Wickstrum, it did not identify any such errors in Lentsch's calculation of 1,915 acre-feet as the decrease in safe yield from application of the 2003 Biological Opinion operating criteria.[195]

**Fish Screen Clogging Causes Water Losses of 1,577 Acre-Feet per Year**

86.     The Robles Diversion Dam includes a fish screen designed to meet NMFS' published fish screen design criteria.[196]  The fish screen is made of stainless steel, perforated with thin slots of about an eighth of an inch that permit water to pass through into the Casitas Canal for diversion to Lake Casitas, while not allowing small juvenile steelhead (known as fry) to pass through.[197]  The Court examined a sample of the fish screen during the trial.[198]

---

[193] Spencer, Tr. 257:13 to Tr. 258:11.
[194] Spencer, Tr. 257:4 to Tr. 258:11.
[195] Spencer, Tr. 257:14 to Tr. 258:5.
[196] Def.'s Ex. 235.
[197] Joint Ex. 62 at 3; Cole, Tr. 1180:21–25.
[198] Cole, Tr. 1181:6 to Tr. 1182:17.

87.     The fish screen clogs during storm events, when massive amounts of water surge down the Ventura River.  The water pressure forces soil, leaves, and other plant debris against the screen and as that material collects on the screen, it inhibits the flow of water through the screens and into the Casitas canal.[199]  During high flows, the fish screen can clog in less than an hour.[200]

88.     The design of the fish screen is based on NMFS' guidance document and NMFS generally controlled the critical aspects of the design.  For example, NMFS told Casitas what size to make the fish screen slots and that the screens must contain an automated brush cleaning system:

> Q.   Did NMFS also recommend the size of the perforations in the fish screen?
> A.  Yes.
> Q.  And that's in accordance with the NMFS design criteria for fish screens, right?
> A.  That's correct.[201]
>
> * * *
>
> Q.  Now, one of the provisions of the NMFS fish screen criteria is that fish screens need to be automatically cleaned as often as necessary to prevent the accumulation of debris, right?
> A. That's correct.
> Q.  And that's because the accumulation of debris is pretty much a standard problem with most fish screens, right?
> A.  Yes.[202]

---

[199] Pl.'s Ex. 392 at 1 ("[T]he key difference is that flow to the canal must also pass through a fish screen element that has very fine openings and baffle panels.  The fish screen element has a tendency to collect the finer suspended debris (i.e., tree leaves and grass) and become congested, thus preventing water from flowing through the fish screen element and into the diversion canal."); Joint Ex. 62 at 8; Wickstrum, Tr. 852:16–23; Wickstrum, Tr. 853:3–5; Cole, Tr. 1216:14 to Tr. 1217:2.
[200] Cole, Tr. 1215:4–7.
[201] Lecky, Tr. 1679:7–12.
[202] Lecky, Tr. 1682:9–17.

89.     The clogging of the fish screen reduces the water Casitas can divert from

the Ventura River because

> [w]ater delivery is restricted until maintenance crews arrive and take
> corrective actions.  These frequently require curtailing the diversion flow
> for several hours to mobilize operations crews (especially at night) and
> complete the manual cleaning of the screens.  Due to the limited duration of
> the flood events on the Ventura River, a major portion of the water
> available for diversion may be lost during these events.[203]

90.     Commencing in late 2005 when Casitas completed construction of the fish

passage facility, Ventura experienced several large storms that caused problems with the

fish screen.  Wickstrum testified that Casitas "had four good storms during 2006, and

each of the four storms we had difficulties in keeping up with and removing particularly

the plant material that entered into the Robles Diversion, and impinged itself onto the

fish screens."[204]

91.     Using the data from the 2006 water year, Wickstrum calculated that the

total annual water loss that Casitas can expect from fish screen clogging is 1,577 acre-

feet of foregone diversions.[205]  These calculations were based on actual water losses

incurred by Casitas at that time.[206]  Wickstrum then employed the same predictive

analysis that Lentsch had used to calculate water losses from the 2003 Biological Opinion

operating criteria to determine overall losses resulting from the fish screen.[207]

Wickstrum's analysis showed that during the critical dry period of 1945 to 1965, Casitas

---

[203] Joint Ex. 62 at 8.
[204] Wickstrum, Tr. 852:10–15; *see also* Pl.'s Ex. 182 (describing early operational difficulties); Pl.'s Ex. 392 at 1; Cole, Tr. 1205:19 to Tr. 1206:1; Glowacki, Tr. 1998:21 to Tr. 1999:2.
[205] Wickstrum, Tr. 858:22–23.
[206] Pl.'s Ex. 392 at 3–4; Wickstrum, Tr. 852:24 to Tr. 853:8.
[207] Pl.'s Ex. 392 (detailing Wickstrum's analysis); Wickstrum, Tr. 857:9 to Tr. 858:17.

would have experienced a loss of foregone diversions of 1,118 acre-feet per year.[208]

During the drought recovery period of 1966 through 1980, Casitas would have suffered

an annual loss of 2,220 acre-feet of foregone diversions.[209]

92.     To confirm his conclusions, Wickstrum later asked Neil Cole to provide

updated numbers.  These numbers corroborate the accuracy of Wickstrum's original

analysis.  At trial, Cole testified that he updated the water losses attributable to the fish

screen clogging, testifying that:

> Q.  So, Mr. Cole, what was the result of your calculations?
> A.  In 2005 and '06, I calculated that 1,850 acre feet was lost.  In 2006 and
> '07, it was a very dry year.  There was no water in the river.  We didn't
> even get surface continuity during that year so there was no loss in
> that year.  In 2007 and '08, I calculated 3,890 acre feet of water was lost,
> and in 2008 and '09 I calculated that we didn't lose any water.
> Q.  And why was that?
> A.  In 2008 and '09, we did not have very high flows.  We did divert some,
> but the flows were fairly minimal and we were able to capture all the water
> we were supposed to.
>
> * * *
>
> Q.  So have you performed a calculation or have you averaged out
> the losses?
> A.  Yes.  Just over those four years that averages out to 1,430 acre feet.[210]

93.     Casitas began working to fix the fish screen as soon as Casitas realized that

it was clogging.[211]  NMFS informed Casitas that it was to fix the problems in a prompt

manner and operate in compliance with the Biological Opinion.[212]  But NMFS also

---

[208] Pl.'s Ex. 392 at 5 (chart at the bottom of the page); Wickstrum, Tr. 857:19–22.
[209] Pl.'s Ex. 392 at 5 (chart at the bottom of the page).
[210] Cole, Tr. 1038:23 to Tr. 1039:12; Cole, Tr. 1240:16–21; *see also* Joint Ex. 62.
[211] *See* Joint Ex. 62.
[212] Cole, Tr. 1206:2–8; Pl.'s Ex. 180.

instructed Casitas not to remove the screen for cleaning, except for short periods

at shutdown.[213]

94.     Although Casitas has implemented most of the recommendations for

improving the fish screen made by its consultant, MWH (an engineering and strategic

consulting firm with expertise in fish screen design),[214] Casitas is still experiencing

clogging problems to this day.[215]  But even if Casitas implemented all of the

recommendations contained in the MWH report, Neil Cole, Casitas' Principal Engineer,

testified that, because of the debris the Ventura River carries during storms, there is no

guarantee that implementation of the recommendations would completely solve the

clogging problems.[216]  In fact, because clogging is common among fish passage facilities

that contain a fish screen and because Casitas must divert water every time there are

sufficient flows, it is anticipated that Casitas will never be able to solve the problems

completely.[217]  Other water districts and companies similarly situated to Casitas have

similar problems with fish screen brush systems, and those water districts and companies

have not been able to avoid having clogging problems.[218]

95.     In fact, NMFS recognized this problem even before the fish screen was

constructed, stating in the Biological Opinion that a fish screen is inherently subject to

debris accumulation and that some resulting clogging was inevitable from the installation

of the fish screen:  "Large debris accumulation can affect diversion and fish screen

---

[213] Cole, Tr. 1219:8–9.
[214] Cole, Tr. 1227:9–12.
[215] Cole, Tr. 1228:15–17.
[216] Cole, Tr. 1227:4–8; Thomas, Tr. 268:18 to Tr. 269:11; *see also* Joint Ex. 62.
[217] Cole, Tr. 1231:20–22.
[218] Cole, Tr. 1229:19 to Tr. 1230:25.

operation, clogging portions of the fish screen and creating localized 'hot spots' of increased screen velocity."[219]

**Value of the Water Taken is $25,000 Per Acre-Foot**

96.     In California, and the rest of the arid west, there is a substantial market for water and rights to the use of water are bought and sold in many situations.  Under this rubric, a permanent water supply is different from an annual supply.  The water loss Casitas has suffered due to the 2003 Biological Opinion operating criteria and fish screen limitations has been damaging to Casitas' ability to supply water to its customers.  This is Casitas' water to use; Casitas does not have it anymore.  The fish do.

97.     Casitas presented the written appraisal report and the oral testimony of Dr. Rodney Smith, an economist who specializes in water resources.  Dr. Smith received his B.A. in economics from U.C.L.A. and his Ph.D. in economics from the University of Chicago.[220]  Dr. Smith's years of experience include serving as a professor of economics at Clermont Mckenna College and Columbia University, serving as co-editor of a publication that tracks and publishes water contracts throughout the United States, and serving as Senior Vice President of Stratecon, Inc., an economics and strategic planning consulting firm specializing in the economics, finance, and politics of water resources.[221] He is also a Managing Member of Strategic Water Management LLC, a company that buys and sells water rights.[222]

---

[219] Joint Ex. 48 at 47; *see also* Pl.'s Ex. 180 ("[NMFS] recognizes that any new, complex facility like the Robles Fish Passage Facility is likely to have early operational difficulties.").
[220] Smith, Tr. 996:12–18.
[221] Smith, Tr. 996:19 to Tr. 998:23.
[222] Pl.'s Ex. 248 at 1.

98.     Dr. Smith testified that the proper method for determining a reasonable economic valuation of the lost water supply in this case is to determine the cost of replacing the loss in safe yield resulting from NMFS' actions.[223]   This is because Casitas must replace the decrease in its safe yield resulting from the 2003 Biological Opinion operating criteria to meet the current and future demands of its customers.[224]

99.     Casitas is located in the central coast area of California, a water region that has long been characterized as severely supply-constrained.[225]   Because of this supply shortage, many water districts in the central coast area, including Casitas, have implemented water allocation programs.[226]   Water supply is so valuable to water districts in this area that they spend significant resources to obtain a few extra acre-feet of water, whereas districts in other regions, such as Northern California, only undertake such actions for thousands of acre-feet of water.[227]

100.     Dr. Smith identified three potential sources from which Casitas could potentially replace the loss in safe yield:

a.   California State Water Project ("SWP"):  The SWP is a state operated water project involving the storage and transportation of water from Northern California to locations throughout California, including the central coast area.[228]  Casitas owns participation rights to 5,000 acre-feet of the Ventura County Flood Control District's 20,000 acre-feet entitlement to California's State Water Project.[229] Casitas has been paying an annual fee on this entitlement since the early 1960s, which to date totals approximately $26 million, but has yet to actually use the

---

[223] Smith, Tr. 1025: 20 to Tr. 1027:19.

[224] Pl.'s Ex. 248 at 3–4.

[225] Smith, Tr. 1028:2–8; Pl.'s Ex. 248 at 4–5.

[226] Pl.'s Ex. 248 at 4–5.

[227] Smith, Tr. 1028:21 to Tr. 1029:5.

[228] Pl.'s Ex. 248 at 10.

[229] Smith, Tr. 1044:14 to Tr. 1045:7.

entitlement.[230]  In order to exercise its rights to the SWP entitlement, Casitas, along with Ventura, would be required to construct the necessary connection infrastructure and to pay the associated operating costs and SWP charges.[231]  A 1987 feasibility study estimated that pipeline connection would involve capital costs of $109 million.[232]  When adjusted by the Bureau of Reclamation Cost Index, capital costs today would be $187 million, of which Casitas would be required to pay 25%.[233]  Dr. Smith therefore determined that Casitas' capital costs for connecting to the SWP would be $12,476 per acre-foot, operating costs of $12,476 per acre-foot, and SWP fees of $2,456.50 per acre-foot.[234]  Thus, Dr. Smith calculated the cost of connecting to and using the State Water Project as an alternative source of water at $27,408 per acre-foot.[235]

b.  Carpinteria Valley Water District:  In 2004, Casitas negotiated but did not sign an agreement with the Carpinteria Water District for the one-year lease of 500 acre-feet of water at $640 per acre-foot.[236]  Ultimately, Casitas did not sign the agreement because it would have required Casitas to build the infrastructure to carry the water from Carpinteria to Casitas customers.[237]  To capitalize the transaction as a long-term lease, Dr. Smith assumed that a long-term lease was available at the same price as the short-term lease (adjusted for inflation) and then discounted this figure to present value.[238]  Dr. Smith thus calculated that a long-term lease with the Carpinteria Valley Water District for 500 acre-feet of water would cost $32,500 per acre-foot.[239]

c.  San Antonio Recharge Project:  This proposed project involved Casitas' participation in a consortium to complete the San Antonio Spreading Grounds Rehabilitation.[240]  The project would capture unappropriated excess water during high-flow years to recharge the groundwater basin in Ojai, California.[241]  The water would then be pumped out of the groundwater basin when it is needed.  In calculating the capital costs for completing this project Dr. Smith relied on the project costs set forth in the project sponsors' grant application filed with the California Department of Water Resources, which estimated the costs at

---

[230] *Id.*
[231] Pl.'s Ex. 248 at 10.
[232] *Id.*
[233] Smith, Tr. 1045:14 to Tr. 1046:8.
[234] Pl. Ex. 248 at 12–13.
[235] Smith, Tr. 1047:13.
[236] Pl.'s Ex. 248 at 9–10; Smith, Tr. 1033:6 to Tr. 1034:3.
[237] Smith, Tr. 1034:4–19.
[238] Pl.'s Ex. 248 at 11; Smith, Tr. 1037:4 to Tr. 1038:1038:3.
[239] Pl.'s Ex. 248 at 11; Smith, Tr. 1038:3.
[240] Pl.'s Ex. 248 at 10; Smith, Tr. 1039:8 to Tr. 1040:13.
[241] Smith, Tr. 1039:12 to Tr. 1040:7.

$1,930,745.[242]  Dr. Smith also accounted for the annual operating costs and the expected life of the project.[243]  Based on these factors, Dr. Smith estimated the cost of using the San Antonia Recharge Project as an alternative source of water at $17,427 per acre-foot.[244]

101.    Based on the average value of the three water alternatives, Dr. Smith concluded that the cost of replacing the lost water supply—the reasonable fair market value of the water rights permanently taken from Casitas—is $25,000 per acre-foot.[245]

102.    Dr. Smith's valuation is supported by transactions elsewhere in the Central Coast.  For example, the City of Santa Maria, in addition to other sources, had entitlements and was connected to the State Water Project.  As a result, the city had water that it was not using and, therefore, entered into agreements with developers in a nearby Golden State Water Company service area to provide 900 acre-feet of the city's State Water Project water to developers.  The one-time payment for the provision of service was $25,200 per acre-foot.[246]

103.    Dr. Smith then multiplied the replacement cost/fair market value of $25,000 per acre foot by the 3,492 acre-feet of water taken by NMFS to determine the value of the water taken:[247]

| Source of Supply Loss | Amount Lost (in acre-feet) | Value |
|---|---|---|
| Biological Opinion | 1,915 | $47,875,000 |
| Fish Screen Limitations | 1,577 | $39,425,000 |
| **Total** | **3,492** | **$87,300,000** |

[242] Pl.'s Ex. 248 at 11; Smith, Tr. 1041:11–18.
[243] Pl.'s Ex. 248 at 11–12; Smith, Tr. 1041:24 to Tr. 1042:6.
[244] Smith, Tr. 1042:13–20.
[245] Smith, Tr. 996:12–18.
[246] Smith, Tr. 996:12–18.
[247] Pl.'s Ex. 248 at 14–15.

104.   Steven Herzog, the Government's valuation witness, did not determine the market value of the water taken, as Dr. Smith did.[248]  Instead, the Government instructed him to value the water as "surplus" property in light of Casitas' entire property holdings.[249]  But on cross-examination, Mr. Herzog admitted that the definition of market value does not include a consideration of whether the property right at issue was surplus to the owner nor does it include a consideration of the property owner's larger property holdings.[250]  Ultimately, he admitted that he nonetheless included his opinion that the lost water was surplus to Casitas in his appraisal:

> Q.  Did consideration of the fact that you think this water is surplus to Casitas play any role in your determination of fair market value?
> A.   It played a role in my estimation of the value impact to Casitas' larger parcel.
> Q.  That sounds like a yes.  Yes, you took into account the fact that it was surplus in determining fair market value.  Is that right?
>
> * * *
>
> A.  Okay.  And yes, I did consider it in reaching my conclusions.
> Q.   You considered the fact that this was surplus in reaching your conclusion as to market value?
> A.  I did.
> Q.  Even though the Yellow Book definition does not include any such consideration.
> A.  Yes.[251]

105.   Given the unpredictability of precipitation, especially in the central coast region where Casitas is located, a water district will always divert and store water when it can for the future needs of its customers.  This water is not "surplus water," but can be

---

[248] Herzog, Tr. 2898:20 to Tr. 2901:15.
[249] Herzog, Tr. 2878:11 to Tr. 2881:2.
[250] Herzog, Tr. 2898:20 to Tr. 2901:15.
[251] Herzog, Tr. 2898:20 to Tr. 2900:2.

either used or retained in storage for future use.[252]  Either way, the water has the same

economic value as other water and therefore would not be sold at a discount.[253]

## III.   PROPOSED LEGAL CONCLUSIONS

"[T]he federal government is certainly free to preserve the fish; it must simply pay

for the water it takes to do so."[254]

### A.   Casitas' water license constitutes a constitutionally protected property right

The Federal Circuit has developed a two-part test to evaluate claims that a

governmental action constitutes a taking of private property without just compensation:

> The court must first determine whether the claimant has established the
> existence of a protected property interest for Fifth Amendment purposes.  If
> the court determines that such a property interest exists, it then must
> analyze whether a compensable taking of that interest has occurred."[255]

Here, the property right taken is a portion of Casitas' water right (specifically,

3492 acre-feet) granted by the State of California,  to divert up to 107,800 acre-feet per

year and put 28,500 acre-feet per year to beneficial use,[256] as set forth by the water permit

that the California State Water Resources Control Board ("State Water Board") issued to

Casitas in 1956,[257] and confirmed in a formal water license thirty years later in 1986.[258]

The State Water Board defines the scope of the license, and accordingly, the scope of the

water right, and the State Water Board has never limited the scope of that right to require

---

[252] Smith, Tr. 1021:22 to Tr. 1022:7.
[253] Smith, Tr. 1022:8 to Tr. 1023:16.
[254] *Tulare Lake Basin Water Storage Dist. v. United States*, 49 Fed. Cl. 313, 324 (2001).
[255] *Carpenter v. United States*, 69 Fed. Cl. 718, 729 (2006) (citations omitted).
[256] Joint Ex. 12 at 1.
[257] Def. Ex. 9.
[258] Joint Ex. 12.

water for a fish passage.  Indeed, the State Water Board has expressly refused to do so.[259]

And, from the earliest days of its statehood, California has recognized that such a water

right is a private property right subject to ownership and disposition by the owner, as in

the case of other private property.[260]  "A right may be acquired to [water's] use, which

will be regarded and protected as property[.]"[261]  "[O]nce rights to use water are acquired,

they become vested property rights."[262]  Section 102 of the California Water Code

provides that "[a]ll water within the State is the property of the people of the State, but

the right to the use of water may be acquired by appropriation in the manner provided

by law."[263]

In *United States v. State Water Resources Control Board*, the California Court of

Appeals held that "[i]t is equally axiomatic that once rights to use water are acquired,

they become vested property rights.  As such, they cannot be infringed by others or taken

by governmental action without due process and just compensation."[264]  Likewise, in

*Los Angeles County Flood Control District v. Abbot*, the California Court of Appeals

held that the right to receive water is "a valuable property right" that could not be taken

without just compensation.[265]

---

[259] Def.'s Ex. 171 at 1.
[260] *Lux v. Haggin*, 69 Cal. 255, 265 (1886); *see also United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 744 n.17 (1950).
[261] *Kidd v. Laird*, 15 Cal. 161, 180 (1860); *see also McDonald v. Bear River & Auburn Water & Mining Co.*, 13 Cal. 220, 232 (1859) (describing the right as "substantive and valuable property.").
[262] *Cal. Farm Bureau Fed'n v. Cal. State Water Res. Control Bd.*, 53 Cal. Rptr. 3d 445, 452 (Cal. Ct. App. 2007) (citing *United States v. State Water Res. Control Bd.*, and *Fullerton v. State Res. Control Bd.*, 90 Cal. App. 3d 590, 598 (1979)).
[263] Cal. Water Code § 102.
[264] *United States v. State Water Res. Control Bd.*, 182 Cal. App. 3d 82, 101 (1986) (citations omitted).
[265] *Los Angeles County Flood Control Dist. v. Abbot*, 24 Cal. App. 2d 728, 736 (1938).

The Federal Circuit and the U.S. Supreme Court have also held on many occasions that water rights are property protected by the Fifth Amendment against uncompensated takings.[266] In *Washoe County v. United Sates*, for example, the Federal Circuit stated:

> In the context of water rights, courts have recognized a physical taking where the government has physically diverted water for its own consumptive use or decreased the amount of water accessible by the owner of the water rights. *See Dugan v. Rank*, 372 U.S. 609, 625–26, 10 L. Ed. 2d 15, 83 S. Ct. 999 (1963) (finding a taking where the government diverted water at a dam from downstream owners of water-rights for public purposes); *Int'l Paper Co. v. United States*, 282 U.S. 399, 407–08, 75 L. Ed. 410, 51 S. Ct. 176, 71 Ct. Cl. 780 (1931) (finding a taking where the government ordered diversion of water from the owners of water-rights for use in government power production); *Tulare*, 49 Fed. Cl. at 320 (stating that a deprivation of water from the owner of the water rights amounts to a physical taking).[267]

This Court, too, has recognized that water rights are constitutionally protected property rights:

> This court has concluded that water rights are property protected by the Fifth Amendment in some notable cases. *Hage v. United States,* 35 Fed. Cl. 147 (1996), involved a claim that the government had taken the plaintiff's water rights both by regulatory and physical actions (i.e., "cancelling and suspending [the plaintiffs'] permit and diverting and using their water"). *Id.* at 156. In *Hage,* this court rejected the argument that water rights were "limited, usufructuary rights" not entitled to Fifth Amendment protection. *Id.* at 172. "[W]ater rights are not 'lesser' or 'diminished' property rights unprotected by the Fifth Amendment." *Id.* On the contrary, *Hage* concluded: "Water rights, like other property rights, are entitled to the full protection of the Constitution." *Id.* Likewise, in *Tulare Lake Basin Water Storage Dist. v. United States,* 49 Fed. Cl. 313 (2001), the plaintiffs claimed that the Bureau of Reclamation's decision to reduce water outflows for the preservation of a few species of fish deprived them

---

[266] *See, e.g.*, *Dugan v. Rank*, 372 U.S. 609 (1963); *United States v. Gerlach Live Stock Co.*, 339 U.S. 725 (1950); *Washoe County v. United States*, 319 F.3d 1320, 1326 (Fed. Cir. 2003); *see also Madera Irrigation Dist. v. Hancock*, 985 F.2d 1397, 1401 (9th Cir. 1993) (stating that "a valid contract right [to receive water] of an irrigation district against the United States is property protected by the Fifth Amendment").

[267] *Washoe County*, 319 F.3d at 1326.

of their water rights without just compensation.  *Id.* at 314–15.  This court granted summary judgment in favor of the plaintiffs, concluding that "the government is certainly free to preserve the fish; it must simply pay for the water it takes to do so."  *Id.* at 324.[268]

The Government, in fact, has not denied that Casitas has a property right in its

water license:

> Plaintiff's property interest stems from a permit and license issued by the State Water Resources Control Board ("SWRCB"), which is the California state agency responsible for the issuance of water right permits and licenses for the appropriation of water in California, including the licenses issued to Casitas.[269]

California law, which vests in the State Water Rights Control Board the authority

to issue water rights, provides for an initial permit which, with proper time and use,

ripens into a perfected water right in the form of a water license:

> The issuance of a permit carries forward the right of procedural priority and adds the consent of the state to begin construction and to initiate the use of water, limited by the terms of the permit.  While the issuance of a permit does not confer on the permittee a fully perfected right, it does continue in effect the priority of right and gives the permittee the right to take and use the amount of water specified in the permit until the issuance or the refusal of a license.  The final procedural step in perfecting a water right is the issuance of a license as prescribed in sections 1600 through 1677 of the Water Code.[270]

And that water right continues in effect unless revoked by the State Water Board:

> A permit does not expire merely from the passage of time.  It remains in force until revoked in the manner prescribed by section 1410.  So long as his permit remains in force, his right to take and use the water specified therein continues.[271]

---

[268] *Hansen v. United States*, 65 Fed. Cl. 76, 162–63 (2005).
[269] United States' Pretrial Memorandum 8 (Apr. 19, 2010) [Docket No. 159].
[270] *Eaton v. State Water Rights Bd.*, 340 P.2d 722, 726 (Cal. Dist. Ct. App. 1959) (citations omitted).
[271] *Id.* at 726.

To be sure, the State Water Board retains continuing jurisdiction to amend water rights to protect public trust resources such as the fish.  But the State Water Board has never exercised that continuing jurisdiction with respect to Casitas' water license—and in fact declined to do so in response to California Trout's petition.[272]  Casitas' water right thus remains intact, just as it was issued by the State Board in 1956—and will remain so until and unless modified by the State Water Board in compliance with California law. As it stands today, nothing in Casitas' state-issued water license requires Casitas to provide minimum flows of 50 cubic feet per second for steelhead restoration—the requirement imposed on Casitas by NMFS' Biological Opinion.

The 50 cfs steelhead requirement is thus a requirement of federal law, not California law.  The State of California has never filed an enforcement action against Casitas, nor has it taken any regulatory or administrative action to limit or amend Casitas' license to provide flows for restoration of the steelhead trout.[273]  In fact, since steelhead trout are not even listed as an endangered species under California law,[274] the protections of the California version of the Endangered Species Act do not apply.

The Government's assertion that Casitas' water license does not authorize water diversions that might harm steelhead is simply wrong as a matter of California law.  As the California Supreme Court ruled in the landmark *National Audubon Society* case on which the Government itself relies, "[the state must have the power to grant. . . rights to

---

[272] Def.'s Ex. 171 at 1; Proposed Finding No. 70.
[273] Proposed Finding No. 68–69.
[274] Proposed Finding No. 66.

appropriate water *even if diversions harm the public trust uses*."[275]   As the court further

explained, the needs of people may sometimes outweigh the needs of the fish:

> As a matter of current and historical necessity, the Legislature acting directly or through an authorized agency such as the Water Board, has the power to grant usufructuary licenses that will permit an appropriator to take water from flowing streams and use that water in a distant part of the state, even though this taking does not promote, and may unavoidably harm, the trust uses at the source stream. The population and economy of this state depend upon the appropriation of vast quantities of water for uses unrelated to instream trust values . . . .   [I]t would be disingenuous to hold that such appropriations are and always have been improper to the extent that they harm public trust uses, and can be justified only upon theories of reliance or estoppel.[276]

Casitas' water license thus reflects the judgment of the State Water Board—as the

agency charged with weighing competing interests for the use of California's water—that

Casitas' diversions from the Ventura River best serve the public interest of the State of

California.   Casitas' water license is the culmination of a state-mandated permit process

in which the State Water Board is required to "allow the appropriation for beneficial

purposes of unappropriated water under such terms and conditions as in its judgment will

best develop, conserve, and utilize in the public interest the water sought to be

appropriated."[277]   In determining to issue Casitas' water right, the State Water Board

considered the "relative benefit to be derived from . . . all beneficial uses . . . ."[278]   The

State Water Board also had to "take into account, whenever it is in the public interest, the

amounts of water required for recreation and the preservation and enhancement of fish

---

[275] *Nat'l Audubon Soc'y v. Superior Court*, 33 Cal. 3d 419, 426 (Cal.), *cert. denied sub. nom*, *Los Angeles Dep't of Water & Power v. Nat'l Audubon Soc'y*., 464 U.S. 977 (1983).
[276] *Id.* at 446.
[277] California Water Code § 1253.
[278] California Water Code § 1257.

and wildlife resources."[279]   In fact, the State Water Board must reject an application that is not in the public interest:  "The Board shall reject an application when in its judgment the proposed appropriation would not best conserve the public interest."[280]   As one California court explained:

> The nature of the public interest to be served by the Board is reflected throughout this statutory scheme.   As a matter of state policy, water resources are to be used "to the fullest extent . . . capable" (section 100) with development undertaken "for the greatest public benefit" (section 105).   And in determining whether to grant or deny a permit application in the public interest, the Board is directed to consider "any general or co-ordinated plan . . . toward the control, protection, development. . . and conservation of [state] water resources . . ." (section 1256), as well as the "relative benefits" of competing beneficial uses (section 1257).   Finally, the Board's actions are to be guided by the legislative policy that the favored or "highest" use is domestic, and irrigation is the next highest. (Section 1254).[281]

The Government is flatly wrong in asserting that this Court should simply ignore the State Water Board's public interest determination, made under California state law and embodied in the terms of Casitas' perfected water right, and instead declare that Casitas does not have the water right that California law says it does.   Such a collateral attack on the State Water Board's determination is inconsistent with both the State's authority to allocate its waters and to determine whether those rights constitute property under state law.[282]

---

[279] California Water Code § 1243.
[280] California Water Code § 1255.
[281] *United States v. State Water Res. Control Bd.*, 182 Cal. App. 3d 82, 103 (1986) (citing the California Water Code).
[282] *See California v. United States*, 438 U.S. 645 (1978).

**B.     The Government has physically taken 3,492 acre-feet of Casitas' water for fish restoration purposes under the ESA**

**1.     The Federal Circuit's decision compels a finding that Casitas' water rights were taken to benefit the steelhead**

The Federal Circuit's holding that the Government physically appropriated

Casitas' water for operation of the fish passage facility, taking it for a public purpose,

leaves no room for the Government to now argue that it is not liable for this taking.  The

Federal Circuit held:

> By its own admission, the government required construction of the fish ladder and compelled the water to be rerouted to the fish ladder in order for the fish ladder to operate.  This is no different than the government piping the water to a different location.  It is no less a physical appropriation. . . . In this case . . . the government did commandeer the water for a public use—preservation of an endangered species.   When the government diverted the water to the fish ladder, it took Casitas' water.  The water, and Casitas' right to use that water, is forever gone.[283]

The Federal Circuit thus held that this case should be analyzed as a permanent physical

taking of Casitas' water rights:

> [T]he water that is diverted away from the Robles-Diversion Canal is permanently gone.  Casitas will never, at the end of any period of time, be able to get that water back.  The character of the government action was a physical diversion for a public use—the protection of an endangered species.    The government-caused diversion to the fish ladder has permanently taken that water away from Casitas.  This is not temporary, and it does not leave the right in the same state it was before the government action.  The water, and Casitas' right to use that water, is forever gone.  Unlike *Tahoe-Sierra*, the government, in this case, directly appropriated Casitas' water for its own use—for the preservation of an endangered species.  The government requirement that Casitas build the fish ladder and divert water to it should be analyzed under the physical takings rubric.[284]

---

[283] *Casitas*, 543 F.3d at 1294 (footnote omitted).
[284] *Id.* at 1296.

Specifically, the Federal Circuit stated that by actively causing the physical diversion of water away from the Robles-Casitas Canal—after the water had left the Ventura River and was in the Robles-Casitas Canal—and towards the fish ladder, thus reducing Casitas' water supply, the Government has "physically appropriated water that Casitas held a usufructuary right in."[285]   And the Federal Circuit held that "[w]hen the Government forces Casitas to divert water away from the Robles-Casitas Canal to the fish ladder for the public purpose of protecting the West Coast Steelhead trout, this is a governmental use of the water."[286]   And again, the Court explained that

> once the water is in the canal, it is water that Casitas has diverted pursuant to its allotment.  It thus has become the property of Casitas.  The operation of the fish ladder diversion works thus takes property of Casitas. . . . [T]he government changed the status quo by irrevocably appropriating Casitas' water and sending it down the fish ladder where Casitas could not recover it.[287]

The Federal Circuit's factual understanding of the operation of the fish passage facility—and the diversion of Casitas' water away from the Robles-Casitas Canal required to do so—was based in no small part on the Government's explanation of how the fish passage facility works:

> The government also admits that the operation of the fish ladder required water, which prior to the fish ladder's construction flowed into the Casitas Reservoir via the Robles-Casitas Canal, to be physically diverted away from the Robles-Casitas Canal and into the fish ladder.  Specifically, the government admits that the operation of the fish ladder includes closing the overshot gate, . . . which is located in the Robles-Casitas Canal, and that the closure of this gate causes water that would have gone into the Casitas Reservoir via the Robles-Casitas Canal to be diverted into the fish ladder.

---

[285] *Id.* at 1292.
[286] *Id.* at 1292–93.
[287] *Casitas*, 556 F.3d at 1332.

These admissions make clear that the government did not merely require some water to remain in stream, but instead actively caused the physical diversion of water away from the Robles-Casitas Canal—after the water had left the Ventura River and was in the Robles-Casitas Canal—and towards the fish ladder, thus reducing Casitas' water supply.[288]

The Federal Circuit therefore reached the inexorable conclusion that the taking of

Casitas' water was physical in nature:

[T]he government, in this case, directly appropriated Casitas' water for its own use—for the preservation of an endangered species.  The government requirement that Casitas build the fish ladder and divert water to it should be analyzed under the physical takings rubric.[289]

And because the evidence at trial confirmed the facts as the Federal Circuit

understood them, this Court, too, should find that the Government permanently and

physically took Casitas' water rights to benefit the endangered steelhead—and is

therefore liable for just compensation.[290]

## 2. The taking amounts to 3,492 acre-feet of Casitas' safe yield/water supply

From 1959 until 2003, Casitas operated the Robles Diversion Dam under the 1959

trial operating criteria.[291]  Under these operating criteria, Casitas' diversion of water to

the reservoir was only limited as follows:

In general, when the natural flow of the Ventura River at the Robles Diversion Dam is less than 20 c.f.s., the entire flow will be passed down river and when the natural flow is greater than 20 c.f.s, not less than 20 c.f.s will be passed down river.[292]

---

[288] *Casitas*, 543 F.3d at 1291–92 (citations and footnote omitted).
[289] *Id.* at 1296.
[290] *See id.* at 1291–92.
[291] Barnett, Tr. 159:7–25; Joint Ex. 11.
[292] Joint Ex. 11 at 3.

Thus, under the 1959 trial operating criteria, Casitas was only required to allow the first 20 cfs in the Ventura River to flow downstream to senior water rights holders before it could divert water to the reservoir.[293]   And as the Government's own expert, Curtis Spencer, testified, the water that Casitas must release under the 2003 Biological Opinion operating criteria is water that Casitas cannot store and cannot deliver to its customers:

> Q.  And to the extent that Casitas is required to satisfy that prior obligation under the biological opinion, is it fair to say Casitas is not able to put that water in storage?
> A.   That's correct, the water that Casitas releases under the biological opinion cannot be placed in storage in Casitas.
> Q.  Okay.  And if they can't place it in storage they can't deliver it to the customers, right?
> A.  Correct.[294]

On December 18, 1999, NMFS designated the California steelhead trout for protection under the federal Endangered Species Act.[295]   As a result, on March 31, 2003, NMFS issued the Biological Opinion operating criteria designating a new flow regime for Robles Diversion Dam.[296]   Specifically, the 2003 Biological Opinion operating criteria created a fish passage augmentation season, which runs from January 1 to June 30 each year, during which the Robles Diversion Dam is operated under a different flow regime.[297]   Further, the 2003 Biological Opinion operating criteria also required Casitas to construct a fish passage facility,[298] designed in accordance to specifications and

---

[293] Joint Ex. 11; Barnett, Tr. 160:20–24.
[294] Spencer, Tr. 2589:9–18.
[295] Joint Ex. 78.
[296] Joint Ex. 48.
[297] *Id.* at 6–7.
[298] *Id.* at 4–5.

guidance provided by NMFS,[299] which taken together with the new flow regime aimed to facilitate the upstream and downstream passage of the steelhead.[300]

The 2003 Biological Opinion operating criteria drastically increased the amount of water that Casitas must allow downstream before it can divert water to Lake Casitas.[301] During the fish passage augmentation season, Casitas must maintain downstream flow at or above 50 cfs during the first ten days of each migratory storm event (storms generating flows of 150 cfs or greater).[302]  Additionally, depending on the magnitude of the storm event, the required downstream flows can drastically exceed 50 cfs.[303]  For instance, during the first day of a storm event with flows between 334 cfs and 671 cfs, 171 cfs would have to be allowed to flow downstream.[304]  In between storm events during the fish passage augmentation season, flows must be maintained at 30 cfs as long as incoming flows at the Robles Diversion Dam are greater than 30 cfs.[305]  This, of course, is 10 cfs greater than the required flow under the 1959 trial operating criteria.

In compliance with NMFS' requirements and the mandate of Reclamation, Casitas constructed the fish passage facility to NMFS' specification and implemented the 2003 Biological Opinion operating criteria.  As a direct result of the 2003 Biological Opinion operating criteria prescribed by NMFS, Casitas has suffered—and will continue to suffer—a significant decrease in the quantity of water that it is able to divert to Lake

---

[299] Lecky, Tr. 1679:7–12; Lecky Tr. 1682:9–17; Def. Ex. 235 at 6–10.
[300] Joint Ex. 48 at 5–6.
[301] *Compare* Joint Ex. 11 *with* Joint Ex. 48.
[302] Joint Ex. 48 at 7.
[303] *Id.* at 8.
[304] *Id.* at 8.
[305] *Id.* at 7.

Casitas.[306]  Using flow data incorporated into a hydrological routing model, Lentsch calculated that the 2003 Biological Opinion operating criteria will decrease Lake Casitas' safe yield by 1,915 acre-feet per year over a thirty-six year hydrological cycle.[307]

The fish screen is an integral part of the fish passageway because it prevents steelhead, particularly fry (juvenile steelhead smaller than 2.36 inches in length), from being diverted from the Ventura River into Lake Casitas:[308]  "The screen and bypass shall work in tandem to move out-migrating salmonids (including adults) to the bypass outfall with minimum injury or delay."[309]  Many of Casitas' witnesses, Leo Lentsch, Jean Baldrige, James Word, and Jim Coultas confirmed that the federal government controlled the fish ladder design, repeatedly rejecting Casitas' design proposals as inadequate to satisfy the requirements of the ESA, and insisting that the fish passageway be designed in accordance with NMFS' fish ladder specifications.[310]



**Plaintiff's Exhibit 323**
**Clean Fish Screen**



**Plaintiff's Exhibit 319**
**Clogged Fish Screen**

---

[306] Lentsch, Tr. 663:25, to Tr. 664:11; Pl.'s Ex. 257 at 4.
[307] *Id.*
[308] Cole, Tr. 1082:10–19.
[309] Pl.'s Ex. 65 at 9.
[310] Proposed Findings Nos. 50–51, 61–62.

That fish passageway became fully operational in 2006.[311]  Neil Cole, Principal

Engineer for Casitas, testified that Casitas must now operate the Robles Diversion Dam

so that it first provides water for proper operation of the fish passage and secondly so that

Casitas can divert the remaining water whenever possible.[312]  The combination of the fish

passageway inside the diversion canal was designed to accommodate the fairly unique

steep angle of the grade and topography of the Robles Diversion Dam:

> It is both a fish passage project and a diversion, which is something that is
> not very common.
>
> *  *  *
>
> [O]ften times facilities will have a need for a fish passage like at a dam, but
> they don't need to divert water at the dam.  Other facilities need to divert
> water, but there's no reason to have a fish passage because they aren't
> changing the grade.  This is one project that has to combine both those
> items.[313]

Since the installation of the fish screens—for which NMFS also dictated the

design[314]— debris routinely clogs the opening of the screens during storm events,

plugging the openings, and thereby reducing the volume of water passing through the

screens to the diversion canal.[315]  Clogging of the screens is an inherent problem because

rivers carry leaves, grass, and twigs that inevitably clog the fine mesh of the screen, as

Neil Cole explained at trial:[316]

> [F]low to the canal must also pass through a fish screen element that has
> very fine openings and baffle panels.  The fish screen element has a
> tendency to collect the finer suspended debris (i.e., tree leaves and grass)

---

[311] Wickstrum, Tr. 856:8–18.

[312] Cole, Tr. 1175:11 to Tr. 1176:16.

[313] Cole, Tr. 1175:15–16; Cole, Tr. 1176:10–16.

[314] Lecky, Tr. 1679:7–12; Lecky Tr. 1682:9–17; Def. Ex. 235.

[315] Pl.'s Ex. 392 at 1; Joint Ex. 62 at 8; Wickstrum Tr. 852:16–23; Wickstrum, Tr. 853:3–5; Cole, Tr. 1216:14 to Tr. 1217:2.

[316] Cole, Tr. 1227:4–8; Thomas, Tr. 268:18 to Tr. 269:11; *see also* Joint Ex. 62.

and become congested, thus preventing water from flowing through the fish screen element and into the diversion canal.[317]

As a result of the clogging of the fish screen, Casitas has lost even more water than actually stated in the 2003 flow regime contained in the Biological Opinion.[318]  In 2006, after completion of construction of the fish passage facility and full implementation of the 2003 Biological Opinion operating criteria, Casitas experienced significant problems in diverting water to Lake Casitas during that year's four major storm events because of problems experienced with the fish screens.[319]

At the request of the Casitas Board, Steve Wickstrum prepared a report in which he used actual flow data on the screen clogging from 2006 to calculate future water losses attributable to fish ladder inefficiencies.[320]  His water loss calculations are based on the best available actual water losses incurred by Casitas during 2006.[321]  In addition, Wickstrum's testimony about water losses due to the fish screen clogging reflects his extensive background with the climate and engineering aspects of the Ventura Project.[322]  Based on his experience and expertise, he concluded that fish screen clogging result in an annual diversion loss of 1,577 acre-feet of water.[323]

To confirm his conclusions, he later asked Neil Cole to provide updated numbers. The numbers corroborate the accuracy of Wickstrum's original analysis.  At trial, Cole

---

[317] Pl.'s Ex. 392 at 1.
[318] Wickstrum, Tr. 852:4 to Tr. 854:6.
[319] Wickstrum, Tr.852:4–15.
[320] Pl.'s Ex. 392 (detailing Wickstrum's analysis); Wickstrum, Tr. 857:9 to Tr. 858:23; Proposed Finding No. 89.
[321] Pl.'s Ex. 392 at 3–4; Wickstrum, Tr. 852:24 to Tr. 853:8.
[322] Wickstrum, Tr. 784:15 to Tr. 789:13.
[323] Wickstrum, Tr. 858:22–23; Proposed Finding No. 91.

testified that he updated the water losses attributable to the fish screen clogging,

testifying that:

> Q.  So, Mr. Cole, what was the result of your calculations?
> A.  In 2005 and '06, I calculated that 1,850 acre feet was lost.  In 2006 and '07, it was a very dry year.  There was no water in the river.  We didn't even get surface continuity during that year so there was no loss in that year.  In 2007 and '08, I calculated 3,890 acre feet of water was lost, and in 2008 and '09 I calculated that we didn't lose any water.
> Q.  And why was that?
> A.  In 2008 and '09, we did not have very high flows.  We did divert some, but the flows were fairly minimal and we were able to capture all the water we were supposed to.
>
> * * *
>
> Q.  So have you performed a calculation or have you averaged out the losses?
> A.  Yes.  Just over those four years that averages out to 1,430 acre feet.[324]

And although Casitas has implemented most of the improvements to the fish screen

recommended by MWH, an engineering firm and strategic consulting firm with expertise

in fish screen design,[325] Casitas still experiences clogging problems.[326]  Cole believes that

Casitas will never completely solve the clogging problem because of the nature of the

fish screens.[327]

Other water districts and companies that have been forced to install fish screens

have also had similar problems with fish screen brush systems and those water districts

and companies have not been able to avoid having clogging problems.[328]  But the effects

of the fish screen clogging on other water districts are not comparable to Casitas.  This is

---

[324] Cole, Tr. 1038:23 to Tr. 1039:12; Cole, Tr. 1240:16–21.
[325] Cole, Tr. 1227:9–12; *see also* Joint Ex. 62.
[326] Cole, Tr. 1228:15–17.
[327] Cole, Tr. 1227:4–8; Thomas, Tr. 268:18 to Tr. 269:11; *see also* Joint Ex. 62.
[328] Cole, Tr. 1229:19 to Tr. 1230:25.

because those water districts are supplied by rivers and other sources that do not run dry for a significant portion of the year and, therefore, shutting down operating to unclog the screens has a minimal—if any—impact on the district's overall water supply.[329]  But Casitas cannot simply shut down operations to unclog the fish screens during one of the few high flow periods during the year because it would risk losing some of the water that it is permitted to divert.[330]  Therefore, Casitas is forced to operate the diversion dam with clogged fish screens during the most critical periods of flow, which severely impacts Casitas' water supply.[331]

Therefore, as a direct result of the 2003 Biological Opinion operating criteria, the Government has appropriated approximately 3,492 acre-feet of water per year from Casitas, affecting a taking of Casitas' property without just compensation under the Fifth Amendment.

### C.   Under the ESA, Casitas had no choice but to comply with the operating criteria set forth in NMFS' 2003 biological opinion

After trial nothing remains of the Government's defense that Casitas voluntarily relinquished its water to NMFS and we will say little about that defense here.  Moreover, that defense is flatly contradicted by the Government's previous assertion that listing the steelhead trout was a sovereign act that made any other course of action impossible.  Casitas did not voluntarily give up Casitas' water—it was required to do so by NMFS.

---

[329] Cole, Tr. 1230:21 to Tr. 1331:19.
[330] Cole, Tr. 1230:21 to Tr. 1331:19.
[331] Cole, Tr. 1230:21 to Tr. 1331:19.

On March 31, 2003, NMFS issued its Biological Opinion prescribing a new flow regime for the Ventura River.[332]  NMFS' 2003 Biological Opinion operating criteria requires Casitas to allow the first 50–171 cubic feet per second (cfs) of Ventura River water to flow through the fish passage facility and downstream to the Pacific Ocean before Casitas can divert any water for its own use:

> The *minimum* flow rate providing successful steelhead migration through the lower river is 50 cfs.  Therefore downstream released flows at the diversion must be maintained at or above 50 cfs during the first 10 days of each migratory storm event . . . .[333]

On April 9, 2003, at its first meeting following NMFS' issuance of the Biological Opinion, Casitas' Board of Directors unanimously adopted a resolution that leaves no doubt that the Board was coerced into giving up water for the fish ladder.  In part that resolution reads:

> WHEREAS, on March 31, 2003, National Marine Fisheries Service signed the Biological Opinion and delivered that Opinion to Casitas on April 2, 2003; and
>
> WHEREAS, the Biological Opinion requires that Casitas release up to 3,200 acre feet of safe yield in violation of Casitas' agreement with the United States of America and in effect taking the property of Casitas without compensation; and
>
> *   *   *
>
> WHEREAS, Section 9 of the Endangered Species Act makes it illegal to take endangered species such as the steelhead trout and provides civil and criminal penalties for that take; and
>
> WHEREAS, the Biological Opinion dated March 31, 2003, provides that "If Reclamation (1) fails to assume and implement the terms and conditions, or (2) fails to require Casitas to adhere to the terms and conditions of the incidental take statement through enforceable terms that

---

[332] Joint Ex. 48.

[333] *Id.* at 7.

are added to the permit or grant document, the protective coverage of section 7(o)(2) may lapse."; and

WHEREAS, the lapsing of the incidental take statement will subject Casitas to Section 9 of the Endangered Species Act; and

* * *

WHEREAS, Casitas is under a powerful coercive effect to move forward with the fish passage project; and

WHEREAS, Casitas, after being directed by Reclamation, is the action agency that has a Biological Opinion directed at its operation and feels that it has been coerced into following the Biological Opinion.[334]

This Board Resolution was consistent with the position Casitas had steadfastly maintained throughout the Section 7 consultation—that the 20 cfs of flow already provided in the 1959 operating criteria was sufficient to insure steelhead passage in the Ventura River, and that Casitas need not give up any additional water for the fish (at least without just compensation).[335]  Casitas had proposed this 20 cfs flow regime in the draft Biological Assessments that Entrix prepared for NMFS and submitted on December 15, 2000, September 14, 2001, and November 12, 2001.[336]  But NMFS routinely rejected each of Casitas' draft Biological Assessments as inadequate to protect the steelhead, each time commenting that the Robles facility must operate with bypass flows higher than what Casitas and Entrix considered reasonable and necessary.[337]  Finally, at a meeting in Fresno, California on October 15, 2002, NMFS abruptly ended the discussion by

---

[334] Pl.'s Ex. 148 at CMWD_1260245-46
[335] Rogers, Tr. 1917:10–14; Baldrige, Tr. 460:21 to Tr. 461:1–24; Baldrige, Tr. 470:4–24; Baldrige, Tr. 484:7–11; Baldrige, Tr. 581:19–23; Baldrige, Tr. 582:10–14; Baldrige, Tr. 595:16 to Tr. 596:3; Pl.'s Exs. 95, 102, 104A.
[336] Pl.'s Exs. 95, 102, 104A (respectively); Pl.'s Ex. 274 at 19–20; Baldrige, Tr. 484:7–11; Baldrige, Tr. 488:20 to Tr. 489:1.
[337] Jackson, Tr. 1838:15 to Tr. 1839:2; Jackson, Tr. 1840:21–25.

announcing that there would be a 50 cfs minimum fish flow regime for the Ventura River and no further debate.[338]  And in a confirming letter to Casitas, NMFS stated that:

> The *minimum* flow rate providing successful steelhead *(Oncorhynchus mykiss)* migration through the lower river is 50 cfs.  Therefore, downstream released flows at the diversion must be maintained at or above 50 cfs during the first 10 days of each migratory storm event.[339]

Any lingering doubt whether Casitas voluntarily relinquished its water to NMFS was eliminated by the unequivocal trial testimony that it was NMFS, applying the requirements of the Endangered Species Act and its own regulations, that controlled every step of the process that led to the 50 cfs operating criteria set forth in the 2003 Biological Opinion.  First, Reclamation (and not Casitas, which lacked authority to do so) initiated the Section 7 consultation process by letter on March 8, 1999:  "The purpose of this letter is to request informal section 7 consultation and technical assistance in the design construction, operation and maintenance of a fish ladder and screen at Robles Diversion Dam and Canal."[340]  In fact, it was Reclamation's ownership and control over the operation of this Reclamation Act facility—the Ventura River Project—that made consultation under Section 7 of the Endangered Species Act mandatory under Section 7 of the Endangered Species Act (which does not provide for consultation with private parties but only government agencies).[341]

---

[338] Word, Tr. 371:17 to Tr. 372:1.

[339] Joint Ex. 42 at 1.

[340] Joint Ex. 25 at 1.

[341] *See* 16 U.S.C. § 1536(a); 50 C.F.R. § 402.01 ("Section 7(a)(2) of the Act requires every Federal agency, in consultation with and with the assistance of the Secretary, to insure that any action it authorizes, funds, or carries out, in the United States or upon the high seas, is not likely to jeopardize the continued existence of any listed species or results in the destruction or adverse modification of critical habitat.").

And NMFS gave Casitas no choice but to comply with the operating criteria set forth in the Biological Opinion because NMFS presented its operating criteria to Casitas as a "take it or leave it" proposition.  Multiple witnesses at trial confirmed that Casitas had no choice but to accept NMFS' flow regime.  At trial, Casitas Board member Jim Coultas testified that:

> [I]n the event that we didn't give National Marine Fishery Service exactly what they wanted, they would give us a jeopardy opinion.  And that would mean we could not divert water at all.  More than half of our water that we use is diverted from Robles Diversion Dam, if we couldn't divert at all, suddenly we have half the water our customers need.  So we could not risk the jeopardy opinion.  And they said this is what we need, just swallow hard and take it.[342]

Similarly, Board member Jim Word testified that "[t]here seemed to be no compromise whatsoever.  They were dictating what should be done, how it should be done, and our obligation was to do it."[343]  Word further testified to the strong-arm tactics employed by NMFS to force Casitas' compliance with NMFS' "preferred operational scenario":

> [A]fter several public meetings and meetings with [NMFS], we were told that we really had no choice if we wanted to continue diverting, and that meant 40 percent or thereabouts of our water was subject to being lost if we stopped diverting, and that was our choice.  We either built it and managed it to their specifications, or we would be subject to criminal prosecution for violation of the Endangered Species Act, in which case all diversion would cease, and they would start arresting and fining staff.[344]

And Jean Baldrige, a member of the Entrix team that Casitas contracted with to draft the Biological Assessment had a similar view of NMFS' requirements for the flow

---

[342] Coultas, Tr. 72:4–20.

[343] Word, Tr. 367:12–21.

[344] Word, Tr. 371:17 to Tr. 372:1.

regime.  Testifying about the final Biological Assessment, in which Casitas finally

inserted the 50 cfs flow regime that NMFS had dictated, she stated, "I think Casitas felt

they had no choice but to put that flow regime in the biological assessment."[345]

Casitas' fisheries biologist, Leo Lentsch, who worked directly with NMFS and

Entrix on the preparation of the Biological Assessment and attended many of the design

and planning meetings, also testified that he felt that NMFS was clear in indicating that it

would not accept Casitas' proposed flow regime:

> Q.  Did the National Marine Fishery Service ever tell you that they would
> approve at anytime say after October 28, 2002, ever tell you they would
> approve anything other than the flow regime that is included in Joint
> Exhibit 42?
> A.  Well, I wouldn't say they used the term "approve" or "disapprove", and
> I'm sure at some point there was a statement about not being pre-decisional
> in their determination as part of the discussions, but it was clear in terms of
> what they would accept in terms of the flow regime to issue their biological
> opinion.
> Q.  And what flow regime was it clear that they would accept?
> A.   The one that's outlined in this letter and shows up in the
> biological opinion.[346]

Finally, Michael Jackson, Area Manager for Reclamation, testified that he told

John Johnson (Casitas' General Manager at the time) that in order to receive a no

jeopardy opinion that would permit Casitas to continue diversions, Casitas would have to

go along with the flow regime designated by NMFS:

> Q.  And at that meeting [on October 15, 2002] did you ask [M]r. Johnson if
> Casitas wanted a non-jeopardy opinion, or a jeopardy opinion, for this
> particular proposal?
> A.  Yes, I did.
> Q.  And what was his response to your question?

---

[345] Baldrige, Tr. 468:4–9.
[346] Lentsch, Tr. 658:2–18.

A. That he wanted a non-jeopardy opinion.
Q. And did you say anything in response?
A. Yes, I did.
Q. And what was that?
A. Well, then you need to work with them, them meaning NMFS principally, and Fish and Game, and be ready to do something different than what we are currently doing now.[347]

Even Reclamation, exercising its rights as owner with the right to control the Ventura River Project works (and its duty as a federal agency to comply with the Endangered Species Act) ordered Casitas (its maintenance and operations contractor) to comply with the Biological Opinion, stating:  "The Casitas Municipal Water District operates the Ventura Project on Reclamation's behalf, pursuant to Contract 14-06-200-5257 as amended, and as such must also comply with the Terms and Conditions of the BO."[348]

Finally, the Government's assertion that it did not require Casitas to divert water to the fish ladder runs headlong into this Court's and the Federal Circuit's holdings that the Biological Opinion was a sovereign act that made its performance of the water delivery provisions of the contract impossible:

> The government argues that the issuance of the NMFS BiOp and the adoption of the BiOp by the BOR are sovereign acts.  As such, the government contends that it cannot be held liable for failure to perform its contractual duties under Article 4.  We agree.
>
> * * *
>
> We hold that the BiOp opinion and the decision of the BOR to adopt the BiOp opinion are sovereign acts.  As such, it was impossible for the government to perform its contractual requirements under Article 4.

---

[347] Jackson, Tr. 1810:15 to Tr. 1811:21.
[348] Joint Ex. 49.

71

Therefore, the government is not liable for breaching Article 4 of the contract.[349]

A voluntary act by Casitas is not a sovereign act of the federal Government and vice versa. The 50 cfs flow regime requirement in the Biological Opinion is a sovereign act that Casitas was required to comply with—as this Court and the Federal Circuit have held. It is too late now for the Government to claim the opposite and reject its prior positions.

### D.   The water taken is worth $25,000 per acre-foot as just compensation

As just compensation, Casitas is entitled to $25,000 for each acre-foot of water supply/safe yield taken for the fish because, in a takings case like this one, "the owner is to be put in the same position monetarily as he would have occupied if his property had not been taken."[350] Here, placing Casitas in the same place pecuniarily as it would have occupied without the taking means that the Court must award just compensation equal to the reasonable cost to Casitas of replacing the water supply taken by the Government, as measured by safe yield analysis. Given the limited sources of replacement water available to Casitas in the Ventura County area (Dr. Smith identified three such sources while Mr. Herzog did not identify any), that value must fall in the range from $17,427 per acre-foot (the San Antonio ground water project) to $32,500 per acre-foot (the Carpinteria lease).[351] These figures are consistent with the $18,000 per-acre foot capital

---

[349] *Casitas*, 543 F.3d at 1287–88.
[350] *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473 (1973).
[351] Pl.'s Ex. 248 at 10–11; Proposed Finding No. 100.

facilities charge that Casitas charges each new customer to connect to Casitas' water supply.[352]

The law provides little guidance on the valuation of water rights for just compensation, and there is no set rule for determining just compensation in all cases:

> This Court has never attempted to prescribe a rigid rule for determining what is "just compensation" under all circumstances and in all cases. Fair market value has normally been accepted as a just standard. But when market value has been too difficult to find, or when its application would result in manifest injustice to owner or public, courts have fashioned and applied other standards.[353]

The most thorough just compensation analysis for water taken is found in this Court's own decision in *Tulare Lake Basin Water Storage District v. United States*,[354] in which this Court rejected both appraisers' damages models in favor of the actual prices paid for substitute water from the state-operated drought water bank:

> [W]e are unable to conclude that either Mr. Krieger's or Mr. Herzog's valuation model accurately measured the fair market value of the water lost. A much better indication of value, we believe, are the prices set by the Drought Water Bank sales—arm's-length transactions that most closely approximate an open market for water at the precise time when plaintiffs would, as the result of ESA-imposed pumping curtailments, have entered such a market. Indeed, the use of the Drought Water Bank as a replacement market for water was more than theoretical: in the face of the ESA cutbacks, plaintiffs purchased some 110,000 acre-feet of water over the three-year period. Among the replacement options plaintiffs faced, in fact, the Drought Water Bank alone provided a substitute that was available to all plaintiffs.[355]

---

[352] Wickstrum, Tr. 1130:12 to Tr. 1131:3.

[353] *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 (1950); *see also United States v. Toronto, Hamilton & Buffalo Navigation Co.*, 338 U.S. 396, 402 (1949) ("Perhaps no warning has been more repeated than that the determination of value cannot be reduced to inexorable rules.").

[354] *Tulare Lake Basin Water Storage Dist. v. United States*, 59 Fed. Cl. 246 (2003).

[355] *Id.* at 263.

Here, unfortunately, we do not have drought water bank prices to rely on because there is as yet no water delivery infrastructure to get this water to Casitas.[356]   And since the drought water bank sells water only one year at a time (Tulare sought compensation for water losses in only three years—1992 through 1994), drought water bank transactions would not provide the capitalized cost of a permanent water transfer necessary to replace the water supply taken from Casitas.

What we do have, however, is a 1987 feasibility study that assessed Casitas' ability to connect to the State Water Project.  Casitas owns the participation rights to 5,000 acre-feet of the Ventura County Flood Control District's 20,000 acre-feet entitlement from the California State Water Project.[357]   The 1987 feasibility study estimated capital costs of $109 million to connect to the project.[358]   Dr. Smith used the Bureau of Reclamation's Cost Index and estimated the current costs of connecting to the State Water Project at $187 million, of which Casitas would be responsible for 25%.[359]   Dr. Smith then added the expected capital costs per acre-foot ($12,476) to the expected annual operating costs per acre-foot ($12,476) and associated fees per acre-foot ($2,456.60) to estimate the costs of connecting to the State Water Project at $27,408 per acre-foot.[360]   Importantly, that figure does not include the approximately $26 million that

[356] Smith, Tr. 1045:9–10.
[357] Smith, Tr. 1044:14 to Tr. 1045:7.
[358] Pl.'s Ex. 248 at 10; Smith, Tr. 1045:14 to Tr. 1046:8.
[359] Pl.'s Ex. 248 at 10.
[360] Pl.'s Ex. 248 at 12–13; Smith, Tr. 1047:13.

Casitas has paid to the state since the early 1960s as annual fees to keep this State Water Project water right alive.[361]

Almost analogous to the State water bank sales is the nearly completed transaction where, in 2004, Casitas fully negotiated (but never signed) a one-year lease of 500 acre-feet of water at $640 per acre-foot from the Carpinteria County Water District.[362] To capitalize the transaction as a long-term lease, Dr. Smith assumed that a 50-year lease (which is considered fairly permanent) was available at the same price per-acre foot as the original short-term lease and discounted the lease price.[363] Dr. Smith thus determined that a long-term lease for 500 acre-feet of water with the Carpinteria Valley Water District would costs $32,500 per acre-foot.[364]

A third project that could have provided replacement water for Casitas is the San Antonio Recharge Project, which would have used the Ojai Basin as an underground reservoir to store water in wet years and withdraw it in dry years.[365] The capital cost of this project, according to the project sponsors' grant application filed with the California Department of Water Resources, would be $1,930,745.[366] Casitas would be responsible for the annual operating costs associated with the project.[367] Dr. Smith thus estimated that the cost of the San Antonio Recharge Project would be $17,427 per acre-foot.[368]

---

[361] Pl.'s Ex. 248 at 13; Proposed Finding No. 100.
[362] Pl.'s Ex. 248 at 9–10; Smith Tr. 1033:6 to Tr. 1034:3; Proposed Finding No. 100.
[363] Pl.'s Ex. 248 at 11; Smith Tr. 1037:4 to Tr. 1038:3.
[364] Pl.'s Ex. 248 at 11; Smith Tr. 1038:3.
[365] Pl.'s Ex. 248 at 10; Smith Tr. 1039:8 to Tr. 1040:13; Proposed Finding No. 100.
[366] Pl.'s Ex. 248 at 11; Smith Tr. 1041:11–18.
[367] Pl.'s Ex. 248 at 11–12; Smith, Tr. 1041:23 to Tr. 1042:6.
[368] Pl.'s Ex. 248 at 11; Smith, Tr. 1042:13–20.

Finally, a transaction between the central coast town of Santa Maria and a land developer provides a check on Dr. Smith's calculations.  Santa Maria had entitlements and was connected to the State Water Project and, as a result, had water that it was not using.[369]  The town entered into agreements with developers in the nearby Golden State Water Company service area to provide 900 acre-feet of the city's yield from the State Water Project.[370]  The one-time payment was $25,200 per acre-foot,[371] almost identical to the $25,000 figure provided by Dr. Smith to replace Casitas' lost water.

Mr. Herzog, the Government's appraiser, did not examine projects that would actually have provided replacement water to Casitas but instead cited water sales in other parts of California that lack any hydrologic connection to the Casitas water supply area.[372]  Specifically, Mr. Herzog cited the sale of ground water rights in other basins in Southern California.[373]  Under California law, those types of groundwater rights cannot be transferred outside the basin;[374] therefore, they cannot be used to estimate the cost of replacing Casitas' lost water.  Additionally, the circumstances of the basins cited by Herzog are not comparable to Casitas.[375]  The West Coast, Central, Main San Gabriel, and Mojave River basins have supplemental surface water supplies from the State Water Project and, in the case of the first three basins, the Colorado River.[376]  In contrast,

---

[369] Pl. Ex. 248 at 14; Smith, Tr. 1054:24 to Tr. 1056:14.
[370] Pl.'s Ex. 248 at 14; Smith, Tr. 1054:24 to Tr. 1056:14.
[371] Pl.'s Ex. 248 at 14; Smith, Tr. 1055:24 to Tr. 1056:4.
[372] Pl.'s Ex. 273; Smith, Tr. 1064:16 to Tr. 1065:4.
[373] Def.'s Ex. 202 at 72–80.
[374] Pl.'s Ex. 273 at 5; Smith, Tr. 1066:22 to Tr. 1068:15.
[375] Pl.'s Ex. 273 at 5; Smith, Tr. 1068:17 to Tr. 1069:8.
[376] Pl.'s Ex. 273 at 5.

Casitas is currently "disconnected" from the general reach of California water markets.[377] Therefore, prices in those markets are not relevant for assessing the economic circumstances of water in Casitas.[378]

As Dr. Smith noted, the market for permanent water sales—particularly in California's water-poor central coast area—is "thin" (few transactions).[379] Those transactions that do exist, however, are sufficient for this Court to determine that the value of the water taken in this case is $25,000 per acre-foot, and that is the proper measure of just compensation to which Casitas is entitled.

### E.    Casitas is also entitled to interest from the date of taking

Just compensation in this case also requires that the Government pay Casitas interest from the date of the taking.  As the Supreme Court has held, the Constitution requires payment of interest as an element of just compensation:

> The concept of just compensation is comprehensive and includes all elements, "and no specific command to include interest is necessary when interest or its equivalent is a part of such compensation."  The owner is not limited to the value of the property at the time of the taking; "he is entitled to such addition as will produce the full equivalent of that value paid contemporaneously with the taking."  Interest at a proper rate "is a good measure by which to ascertain the amount so to be added."[380]

The proper rate of interest required to achieve just compensation is a question of fact to be determined within the "sound discretion" of the trial court.[381]  The court's goal is to find "an economically rational way to 'insure that [the property owner] is placed in

---

[377] *Id.* at 5.
[378] Pl.'s Ex. 273 at 5; Smith, Tr. 1068:17 to Tr. 1069:8.
[379] Smith, Tr. 1008:4 to Tr. 1011:10.
[380] *Jacobs v. United States*, 290 U.S. 13, 16–17 (1933) (quoting *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 306 (1923)).
[381] *Studiengesellschaft Kohle, M.B.H. v. Dart. Indus., Inc.*, 862 F.2d 1564, 1580 (Fed. Cir. 1988).

as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation.'"[382]

Over the years, this Court has employed various interest rates in cases awarding just compensation, depending on which more accurately reflected the economic harm incurred by the property owners.  For example, in *Miller v. United States*,[383] the court rejected the statutory interest rate of 6% and applied a 12% interest rate, explaining that 6% was unreasonably low given that the defendant had converted the plaintiffs' business interest into a claim:

> The keystone to defendant's argument in favor of limiting the rate of interest to 6 percent is its analogy of plaintiffs' situation to a person who has bought a Government obligation in 1968 at the then current interest rate of 6 percent.  This analogy has several flaws.  No reasonable investor would purchase an obligation with both an uncertain date of maturity and an uncertain amount of principal payable at maturity.  Plaintiffs had their business property involuntarily converted into an extremely illiquid claim against the United States.  Since plaintiffs' options for other investments were effectively cut off, just compensation in this case should include payments for delay of compensation measured by the interest rates prevailing between the taking and payment dates.  The Government, not the unwilling condemnee, should be the one to bear the risk of any fluctuations in interest rates.[384]

And in *NRG Co. v. United States*, this Court further stated that "the point of this decision is not which approach yields a higher or lower interest payment, but rather which approach is the more accurate measure of the economic harm to property owners."[385]   This Court thus has wide discretion in determining the appropriate interest

---

[382] *NRG Co. v. United States*, 31 Fed. Cl. 659, 667 (1994) (quoting *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 (1984)) (alteration in original).
[383] *Miller v. United States*, 620 F.2d 812 (Ct. Cl. 1980).
[384] *Id.* at 839 (footnote omitted).
[385] *NRG Co.*, 31 Fed. Cl. at 670 n.8.

rate to use when calculating just compensation.[386]   In the *Tulare* case, this Court awarded interest based on the rates paid by the state-sanctioned accounts in which California water districts are required to invest their funds,[387]  holding that these interest rates best comport with the prudent investor rule:

> [I]n light of the requirements of the prudent investor standard, we are compelled by the Ninth Circuit's conclusion that "because a reasonably prudent investor would diversify his risk, it is proper to consider the rate of interest paid on different types of securities with different maturities." *United States v. 429.59 Acres of Land*, 612 F.2d at 465 (endorsing a rate that was derived from an average of "six -month Treasury bills, four- to six-month prime commercial paper, ninety-day prime bankers acceptances, and six-month bank certificates of deposit").   Indeed, numerous courts have applied market-based measures—as, for instance, corporate bond rates-to calculate the interest that would reasonably have been generated on a timely payment of just compensation.  *See, e.g.*, *Miller v. United States*, 620 F.2d at 840; *Georgia-Pacific*, 640 F.2d at 365; *Pitcairn*, 547 F.2d at 1121. Consistent with this approach, we conclude that the best measure of compensation in our own case is the rates of return achieved on plaintiffs' state-sanctioned accounts—accounts whose mix of investment instruments, we believe, provides a reasonable rate of return consistent with a high level of safety.[388]

Casitas, like the water districts in *Tulare*, invests its funds in state-sanctioned accounts in compliance with California law.  Since 2005, Casitas has invested about 80% of its funds in the Local Agency Investment Fund and about 10% each in the Ventura Pooled Money Investment Account and U.S. Treasury bonds.[389]  Casitas believes these investments represent both prudent and actual investments by the water district and thus

---

[386] *See Tulare Lake Basin Water Storage Dist. v. United States*, 61 Fed. Cl. 624, 627 (2004) ("[N]o consensus has emerged with regard to the appropriate interest rate to be employed in just compensation cases . . . .").

[387] *Id.* at 630; *see also* Cal. Gov. Code §§ 16429.1, 53601 (Deering 2010); Cal. Water Code §§ 44456, 44852 (Deering 2010).

[388] *Tulare*, 61 Fed. Cl. at 628.

[389] Should the Court or the Government wish, Casitas will submit a declaration regarding the investment of its funds since the date of taking in 2005.

serve as the most accurate interest rate for calculating just compensation in this case.  If this Court agrees to use these interest rates, Casitas will provide the historic rates and calculate the interest due.

**F.      There is no appropriate mechanism for this Court to certify the water rights issue to the State Water Resources Control Board**

The Government has argued that Casitas' water right does not include the right to divert the water required under the Biological Opinion for fish protection.  And this Court has asked whether this issue should have been submitted to California's State Water Resources Control Board ("State Water Board") for resolution.  At first blush, this could appear to be an attractive alternative, but upon inspection, there does not appear to be a suitable vehicle for submitting this issue to the State Water Board.

First, traditional certification is not available here because California's certification provision authorizes only an appellate court, in this case the Federal Circuit, to certify controlling, unanswered issues to the California Supreme Court:

> On request of the United States Supreme Court, a United States Court of Appeals, or the court of last resort of any state, territory, or commonwealth, the Supreme Court may decide a question of California law if:
> (1) The decision could determine the outcome of a matter pending in the requesting court; and
> (2) There is no controlling precedent.[390]

The only other possible option is Section 2075 of the California Water Code, which allows federal courts to refer issues to the State Water Board for preliminary determination, much as a court would refer an issue to a special master.[391]  This provision

---

[390] Cal. Rules of Court, R. 8.548(a) (2011).
[391] Cal. Water Code § 2075 (Deering 2010).

does not operate as a certification statute.  Indeed, the current version of Section 2075 was originally enacted in 1943, many decades before California even permitted certification; related provisions are even older.[392]  Instead, Section 2075 authorizes the State Water Board only to serve "as master or referee for the court"[393] and usually in water adjudication or water rights disputes.

References under Section 2075 by a federal court are made under an appropriate rule governing the appointment of special masters, in this case, RCFC 53(a). RCFC 53(a) states that "[u]nless a statute provides otherwise, the chief judge, at the request of the assigned judge, may appoint a master only to:"[394]

    (A)    perform duties consented to by the parties;
    (B)    hold trial proceedings and make or recommend findings of fact if appointment is warranted by:
        (i)    some exceptional condition; or
        (ii)    the need to perform an accounting or resolve a difficult computation of damages; or
    (C)    address pretrial and posttrial matters that cannot be effectively and timely addressed by the assigned judge.[395]

Rule 53(a) does not contemplate that a special master will resolve legal issues such as the nature of Casitas' property right at issue in this case.  Under the rule, special masters perform administrative duties and advise on questions of fact, while "questions of law . . . are matters for the courts."[396]  For example, in *Althen v. Secretary of Health and Human Services*, the chief special master of this Court created and applied a

---

[392] *E.g.*, Cal. Water Code § 2000 (Deering 2010) (permitting the Board to accept reference by a state court).
[393] Cal. Water Code § 2075 (Deering 2010).
[394] RCFC 53(a).
[395] *Id.*
[396] *Althen v. Sec'y of Health and Human Servs.*, 418 F.3d 1274, 1280 (2005).

causation test to resolve a legal question of causation.[397]  The judge held that this course

of action exceeded the "limited role" of a special master,[398] and the Federal Circuit

affirmed, stating that the "special master's role is to apply the law," and not to answer

abstract legal questions.[399]  Like any other special master that could be appointed through

RCFC 53(a), the Water Board may advise on factual issues, but as a special master it

cannot determine legal issues such as the extent of Casitas' water right in a takings case.

Likewise, Section 2075 itself does not authorize the State Water Board to

conclusively answer a question of abstract state law.  Again, Section 2075 only permits

the State Water Board to advise a court, and unless the parties stipulate otherwise, those

findings are subsequently reviewed de novo by the trial judge.[400]  For example, in

*Stockton East Water District v. United States*,[401] Judge Wanger referred to the Water

Board some "complex fact-finding requiring technical expertise."[402]  Specifically, Judge

Wanger referred

> factual issues as to the nature and extent of control the CALFED Ops
> Groups possesses over the CVP [Central Valley Project] and SWP [State
> Water Project], how the Coordination and Principles Agreements have been
> interpreted and implemented by the Bureau [Bureau of Reclamation] and
> DWR [Department of Water Resources], and what role (if any) the
> potential cost savings played in motivating the creation of these
> Agreements.  Based on the facts in the record, the extent of Federal
> Defendants' involvement in the actions of the DWR is unclear.[403]

---

[397] *Althen v. Sec'y of Health and Human Servs.*, 58 Fed. Cl. 270, 278–79 (2003).
[398] *Id.* at 281–82.
[399] *Althen*, 418 F.3d at 1280.
[400] *See* RCFC 53(f)(3).
[401] Order, *Stockton East Water Dist. v. United States*, No. 93-5896 (E.D. Cal. May 8, 1997) (order on motion to dismiss and/or strike and on motion for summary judgment).
[402] *Id.* at 17–18.
[403] *Id.* at 25–26.

Judge Wanger explained why he agreed to refer these and other factual questions in the case to the State Water Board:

> The SWRCB has expertise in interpreting and implementing California water law.  It has expertise in water resource management, hydrology, and engineering; the Court has no such experts or expertise.  In addition, many of the materials Stockton East and Central Delta rely upon in challenging the AG Opinion were written by the SWRCB.  To most effectively employ judicial and administrative expertise and resources, the Court will refer all issues surrounding Stockton East's and Central Delta's claims under Section 11460 [of the Watershed Protection Act] to the SWRCB under a Section 2075 reference.
>
> The SWRCB will make factual findings regarding Stockton East's and Central Delta's claims to determine whether Section 11460 grants Stockton East and/or Central Delta any water rights.  Such factual findings will include:  whether Plaintiffs can conveniently be supplied water from the watershed or an adjacent area; what quantity of water is reasonably required to adequately supply the beneficial needs of the watershed, area, or of the inhabitants of property owners therein; whether the Bureau's water releases for fish and conservation purposes were "out of the basin" or "out of the watershed"; the extent of the watershed; and so on.  These factual questions are best answered by the SWRCB, the agency with unique expertise in this area.[404]

And it is also important to note that the parties had asked Judge Wanger to refer these factual issues to the State Water Board.  Here, Casitas has vigorously opposed this option because of the significant delay and costs associated with referrals to the State Water Board.  Appointing a master to consider "dispositive matters without the parties' consent . . . has led appellate courts to almost automatic reversal on the ground that the appointment was improper."[405]  One case, albeit from another circuit, is instructive of this point.  In *Le Buy v. Howes*, a master was appointed to take evidence and report suggested

---

[404] *Id.* at 34–35.
[405] 9 Moore's Federal Practice § 53.10(1)(b).

findings of fact and conclusions of law.[406]  After the parties objected, the Seventh Circuit

held that the type and scope of the reference was such that the master was essentially

being asked to decide liability, and that a writ of mandamus was necessary to correct the

trial court.[407]  The Supreme Court agreed.[408]  Section 2075 permits the State Water Board

only to assist a court in developing factual information, and with the parties' consent, that

was how it was used in *Stockton East*.

Therefore, there is no certification process available by which this Court may

certify a legal issue to the Water Board.  RCFC 53(a) and Section 2075 both contemplate

reference of complex factual issues but not legal issues to the State Water Board for a

recommendation.  And because both parties have not consented to the referral of this

issue to the State Water Board, the reference procedure was properly rejected by this

Court in this case.

**Conclusion**

For all these reasons, the Court should grant judgment for Casitas and award it

$87,300,000 in just compensation plus interest.  The Court should also award attorneys'

fees and costs in an amount yet to be determined.

---

[406] *La Buy v. Howes*, 352 U.S. 249, 253 (1957).
[407] *Howes Leather Co. v. La Buy*, 226 F.2d 703, 710–11 (1955).
[408] *La Buy*, 352 U.S. at 252–260.

Respectfully submitted,


  s/ Roger J. Marzulla
Roger J. Marzulla
Nancie G. Marzulla
MARZULLA LAW, LLC
1150 Connecticut Avenue, NW
Suite 1050
Washington, DC 20036
(202) 822-6760 (telephone)
(202) 822-6774 (facsimile)

Dated:  January 17, 2011          Counsel for Plaintiff